# United States Court of Appeals
## For the First Circuit

Nos. 16-1424
    16-1435
    16-1474
    16-1482

PENOBSCOT NATION; UNITED STATES, on its own behalf, and for the
benefit of the Penobscot Nation,

Plaintiffs, Appellants/Cross-Appellees,

v.

AARON M. FREY, Attorney General for the State of Maine; JUDY A.
CAMUSO, Commissioner for the Maine Department of Inland
Fisheries and Wildlife; DAN SCOTT, Colonel for the Maine Warden
Service; STATE OF MAINE; TOWN OF HOWLAND; TRUE TEXTILES, INC.;
GUILFORD-SANGERVILLE SANITARY DISTRICT; CITY OF BREWER; TOWN OF
MILLINOCKET; KRUGER ENERGY (USA) INC.; VEAZIE SEWER DISTRICT;
TOWN OF MATTAWAMKEAG; COVANTA MAINE LLC; LINCOLN SANITARY
DISTRICT; TOWN OF EAST MILLINOCKET; TOWN OF LINCOLN; VERSO PAPER
CORPORATION,

Defendants, Appellees/Cross-Appellants,

EXPERA OLD TOWN; TOWN OF BUCKSPORT; LINCOLN PAPER AND TISSUE
LLC; GREAT NORTHERN PAPER COMPANY LLC,

Defendants, Appellees,

TOWN OF ORONO,

Defendant.

APPEALS FROM THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, <u>Chief Judge</u>,
Selya, Lynch, Thompson, and Barron,
<u>Circuit Judges</u>.*

———————————

<u>Pratik A. Shah</u>, with whom <u>Lide E. Paterno</u>, <u>Akin Gump Strauss Hauer & Feld LLP</u>, <u>Kaighn Smith, Jr.</u>, <u>David M. Kallin</u>, and <u>Drummond Woodsum</u> were on brief, for appellant/cross-appellee Penobscot Nation.

<u>Mary Gabrielle Sprague</u>, Attorney, Environment and Natural Resources Division, United States Department of Justice, with whom <u>Jeffrey Bossert Clark</u>, Assistant Attorney General, and <u>Eric Grant</u>, Deputy Assistant Attorney General, were on brief, for appellant/cross-appellee United States.

<u>Kimberly Leehaug Patwardhan</u>, Assistant Attorney General for the State of Maine, with whom <u>Aaron M. Frey</u>, Attorney General for the State of Maine, and <u>Christopher C. Taub</u>, Deputy Attorney General for the State of Maine, were on brief, for state defendant appellees/cross-appellants.

<u>Joshua D. Dunlap</u>, with whom <u>Matthew D. Manahan</u> and <u>Pierce Atwood LLP</u> were on brief, for state intervenor appellees/cross-appellants.

———————————

Opinion En Banc

———————————

July 8, 2021

———————————

———————————

* Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the opinion in this case.

**LYNCH**, **Circuit Judge**. On August 20, 2012, the Penobscot Nation (the "Nation") brought suit against the State of Maine and various state officials (the "State Defendants"). The Nation stated in its original complaint, later amended, that when it entered into an agreement with Maine to settle its land claims in the state, "the Nation never intended to relinquish its ownership rights" to a 60-mile stretch of the Penobscot River (the "River") known as the Main Stem and that Congress intended "that the Nation's reservation encompass ownership rights within and attending" the Main Stem. The complaint sought (1) a declaratory judgment that the Nation had exclusive regulatory authority over the Main Stem; and (2) a declaratory judgment that the Nation had sustenance fishing rights in the Main Stem. The United States intervened in support of the Nation. Private interests, towns, and other political entities (the "State Intervenors") intervened in support of the State Defendants.

"Penobscot Indian Reservation" (the "Reservation") is defined in a pair of statutes -- the Maine Implementing Act ("MIA") and the Maine Indian Claims Settlement Act ("MICSA") -- collectively known as the Settlement Acts. See Me. Rev. Stat. Ann. tit. 30; 25 U.S.C. § 1721 et seq. The district court, on cross-motions for summary judgment, issued declaratory relief saying that the Reservation does not include the waters of the Main Stem or the submerged lands of the riverbed underneath it but

holding that the Nation has sustenance fishing rights in the Main Stem.  See Penobscot Nation v. Mills, 151 F. Supp. 3d 181, 222-23 (D. Me. 2015).  A divided panel of this court affirmed the district court's holding as to the definition of Reservation and vacated its holding as to the Nation's sustenance fishing rights.  The Nation and the United States petitioned for rehearing en banc.  We vacated the panel opinion and dissent and granted the petition.  Penobscot Nation v. Frey, 954 F.3d 453, 453 (1st Cir. 2020).

In this en banc decision, we hold that the Reservation does not include the waters and submerged lands constituting the riverbed of the Main Stem.  The plain text of the definition of Reservation in MIA and MICSA plainly and unambiguously includes certain islands in the Main Stem but not the Main Stem itself.  We also hold that even if there were some arguable ambiguity as to the language at issue, the context, history, and clear legislative intent require rejection of the Nation's claim.  As to the Nation's sustenance fishing claim, we do not accept the Nation's argument that its sustenance fishing rights alter the meaning of Reservation.  We disagree that they have anything to do with the definition of Reservation.  Such fishing rights do not alter or call into question the clear definition of Reservation.  As to the Nation's claim that Maine has infringed those fishing rights, that claim is not ripe and the Nation lacks standing.

## I. Facts and Procedural History

The Penobscot River runs through the state of Maine. Its East and West Branches meet at the River's Main Stem, and the Main Stem stretches south for 60 miles. Within the Main Stem are a number of islands, including Indian Island, the Nation's headquarters.

Going back centuries, various iterations of the Indian Nonintercourse Act, 25 U.S.C. § 177, along with a series of treaties and transactions between the Nation and Massachusetts[1] and the Nation and Maine, clouded title to certain land and natural resources in Maine. See id. § 1721(a)(1). In 1980, the United States, Maine, the Nation, and other Indian tribes in Maine reached an agreement which "represent[ed] a good faith effort . . . to achieve a fair and just resolution of those claims which, in the absence of agreement, would be pursued through the courts for many years to the ultimate detriment of [Maine] and all its citizens, including the Indians." Me. Rev. Stat. Ann. tit. 30, § 6202; see 25 U.S.C. § 1721(7). To implement this agreement, Maine passed MIA, Me. Rev. Stat. Ann. tit. 30, § 6201 et seq., and Congress passed MICSA, 25 U.S.C. § 1721 et seq.

---

[1] Present-day Maine was part of Massachusetts until 1820.

MICSA defines "Penobscot Indian Reservation" as "those lands as defined in [MIA]." 25 U.S.C. § 1722(i). MIA defines the Reservation as:

[T]he islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act.

Me. Rev. Stat. Ann. tit. 30, § 6203(8).[2]

MIA also addresses the Nation's sustenance fishing rights, saying:

Notwithstanding any rule or regulation promulgated by the [Maine Indian Tribal-State Commission] or any other law of the State, the members of the Passamaquoddy Tribe and the Penobscot Nation may take fish, within the boundaries of their respective Indian reservations, for their individual sustenance subject to the limitations of subsection 6.

Id. § 6207(4).[3]

On August 8, 2012, Maine's then-Attorney General, William Schneider, issued a legal opinion (the "Schneider Opinion") interpreting MIA and MICSA. This opinion said that the River is not part of the Nation's Reservation and that Maine has

---

[2] The Reservation also includes a few other parcels not at issue here. See Me. Rev. Stat. Ann. tit. 30, § 6203(8).

[3] Subsection 6 gives Maine's Commissioner of Inland Fisheries and Wildlife the right "to conduct fish and wildlife surveys within Indian territories." Me. Rev. Stat. Ann. tit. 30, § 6207(6).

"exclusive regulatory jurisdiction over activities taking place on the River." The Schneider Opinion did not mention § 6207(4) of MIA or the Nation's sustenance fishing rights.

Twelve days later, on August 20, 2012, the Nation filed suit against the State Defendants. In its second amended complaint, it disputed the Schneider Opinion's interpretation of federal law. It sought a declaratory judgment that the Nation has exclusive regulatory authority over the Main Stem and that the Nation's members have the right to take fish for their individual sustenance from the Main Stem which Maine has infringed.

On February 15, 2013, the State Defendants answered the Nation's complaint and filed a counterclaim for declaratory relief. They sought a declaratory judgment that "[t]he waters of the main stem of the Penobscot River are not within the Penobscot Nation reservation."

The State Intervenors -- a group of eighteen private parties, municipalities, and related entities that border the River and use it for discharges or other purposes -- moved to intervene in support of the State Defendants. The district court granted this motion on June 18, 2013. It also granted the United States' motion to intervene in support of the Nation on February 4, 2014.

In 2015, the State Defendants, the Nation, and the United States moved for summary judgment. The State Intervenors filed a

motion for judgment on the pleadings.  After holding oral argument on these motions, the district court declared that (1) "the Penobscot Indian Reservation as defined in [MIA and MICSA] includes the islands of the Main Stem, but not the waters of the Main Stem" and (2) "the sustenance fishing rights provided in [MIA] allows the Penobscot Nation to take fish for individual sustenance in the entirety of the Main Stem."  Penobscot Nation, 151 F. Supp. 3d at 222-23.[4]  The parties cross-appealed.

On June 30, 2017, a divided panel affirmed the district court's declaratory judgment regarding the definition of "Penobscot Indian Reservation" under MIA and MICSA and vacated with instructions to dismiss for want of jurisdiction its declaratory judgment regarding the Nation's sustenance fishing rights under MIA.  Penobscot Nation v. Mills, 861 F.3d 324, 338 (1st Cir. 2017).  The Nation and the United States petitioned for rehearing en banc.  We granted these petitions on April 8, 2020, and vacated the panel opinion and dissent.  Penobscot Nation, 954 F.3d at 453.  We heard oral argument on September 22, 2020.

## II.  Analysis

We review grants of summary judgment de novo including when, as here, there were cross-motions for summary judgment before

---

[4]    On the same day, in a separate order, the district court granted in part and denied in part the State Intervenors' motion for judgment on the pleadings for the same reasons the court gave in its order on the other parties' summary judgment motions.

the district court.  <u>Signs for Jesus</u> v. <u>Town of Pembroke</u>, 977 F.3d 93, 99 (1st Cir. 2020).

A. <u>The "Penobscot Indian Reservation" Does Not Include the Waters or Submerged Lands of the Main Stem.</u>

The State Defendants and the State Intervenors argue that the Reservation includes only the islands identified in § 6203(8) of MIA, not the water or bed of the Main Stem.  In contrast, the Nation says that the Reservation includes both the islands referred to in § 6203(8) of MIA and the entire Main Stem, bank-to-bank, including its submerged lands.  The United States agrees with the Nation.  Alternatively, it says that the Reservation extends, at the very least, from the islands referenced in § 6203(8) to the "thread," or centerline, of the River.  Under this interpretation, the Reservation would include portions of the River that surround each of its islands.

1. <u>"Penobscot Indian Reservation" is Unambiguously Defined in the Settlement Acts to Exclude the Main Stem.</u>

To determine whether "Penobscot Indian Reservation" includes the River's waters and submerged lands, we must interpret that term as it is defined in the text of the Settlement Acts.  We begin with the text itself.  <u>See, e.g.</u>, <u>Barnhart</u> v. <u>Sigmon Coal Co.</u>, 534 U.S. 438, 450 (2002) ("As in all statutory construction cases, we begin with the language of the statute."); <u>United States</u> v. <u>Alvarez-Sanchez</u>, 511 U.S. 350, 356 (1994) ("When interpreting a statute, we look first and foremost to its text.").  When

- 9 -

interpreting the Settlement Acts, we use ordinary tools of statutory construction.  See Maine v. Johnson, 498 F.3d 37, 44-45 (1st Cir. 2007) (treating the Settlement Acts "as a matter of federal law" and using "ordinary statutory construction" when interpreting them).  As we discuss later, none of the Indian canons of construction alter the Settlement Acts' definition of Reservation.

Our "first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"  Barnhart, 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).  "[I]f the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'"  Robinson, 519 U.S. at 340 (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240 (1989)), then "[o]ur inquiry must cease," id.; see Niz-Chavez v. Garland, 141 S. Ct. 1474, 1480 (2021); Babb v. Wilkie, 140 S. Ct. 1168, 1172 (2020); Aroostook Band of Micmacs v. Ryan, 484 F.3d 41, 50-51, 53 (1st Cir. 2007) (following MICSA's plain meaning when "MICSA is clear" and the "statutory scheme is a consistent whole on the issue in question"); see also id. at 64 n.28.  When the text is unambiguous and the statutory scheme is coherent and consistent, we do not look to legislative history or Congressional intent.  Carcieri v. Salazar, 555 U.S. 379, 392 (2009) ("We need not consider [arguments about Congress's intent behind the Indian

Reorganization Act] because Congress' use of the word 'now' . . . speaks for itself and 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992))).

In relevant part, § 6203(8) of MIA says: "'Penobscot Indian Reservation' means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with [Massachusetts and Maine] consisting solely of Indian Island . . . and all islands in that river northward thereof that existed on June 29, 1818 . . . ." It is clear from MIA's text that the Reservation includes "islands." Because "islands" is an undefined term, we "construe it 'in accordance with [its] ordinary meaning.'" See Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 553 (2014) (alteration in original) (quoting Sebelius v. Cloer, 569 U.S. 369, 376 (2013)). Dictionaries are useful aids in determining a word's ordinary meaning.[5] See, e.g., id. at 553-54

---

[5] We interpret a statute's language in accordance with its ordinary meaning at the time of its enactment. See Niz-Chavez, 141 S. Ct. at 1480; Bostock v. Clayton County, 140 S. Ct. 1731, 1750 (2020). The Settlement Acts were enacted in 1980. The meaning of the word "island" has not changed over the past few decades. See Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00121797 (defining "island" as "[a] piece of land completely surrounded by water," the same definition as in the most recent version of the dictionary). "Island" has had the same meaning for at least the past few centuries. See Noah Webster, Compendious Dictionary of the English Language 166 (1806) (defining "island" as "land surrounded by water"); Samuel Johnson,

- 11 -

(citing dictionary definitions of "exceptional" to determine its ordinary meaning); Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter, 575 U.S. 650, 662 (2015) (citing dictionary definitions of "pending" to determine its ordinary meaning).

An "island" is "[a] piece of land completely surrounded by water." Oxford English Dictionary Online, https://www.oed.com/view/Entry/99986 (last visited Jan. 14, 2021) (first definition). Other dictionaries confirm this ordinary meaning. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/island (last visited Jan. 14, 2021) (first definition) ("An island is a piece of land that is completely surrounded by water."); Black's Law Dictionary (11th ed. 2019) (first and only definition) (defining "island" as "[a] tract of land surrounded by water and smaller than a continent").

These definitions make two things clear. First, an island is "a piece of land." Land does not ordinarily mean land and water. Indeed, land is ordinarily defined in opposition to water. Oxford English Dictionary Online, https://www.oed.com/view/Entry/105432 (last visited Jan. 14, 2021) (first definition) (defining "land" as "[t]he solid portion of the earth's surface, as opposed to sea, water" (emphasis added)).

_____

Dictionary of the English Language (6th ed. 1785) (defining island as "[a] tract of land surrounded by water").

MICSA incorporates MIA's definition of "Penobscot Indian Reservation" by saying that that Reservation means "those lands as defined [in MIA]," 25 U.S.C. § 1722(i) (emphasis added), reinforcing that the Reservation consists of land only. MICSA does not say "lands and waters" or "land or other natural resources."[6] Second, the piece of land constituting an island is "surrounded by water." Water is important to the definition of "island" because the presence of water around a piece of land is what makes that piece of land an island. The surrounding water is not itself part of an island. Indeed, Black's Law Dictionary goes on to say that the word island is used "esp[ecially]" to mean "land that is continually surrounded by water and not submerged except during abnormal circumstances." Black's Law Dictionary (11th ed. 2019) (emphasis added).

The plain meaning of "island" is reinforced by § 6023(8)'s use of the phrase "in the Penobscot River" (emphasis added). The definition references the Penobscot River to tell us where the islands are located and which body of water surrounds them. That is what the preposition "in" means. Oxford English Dictionary Online, https://www.oed.com/view/Entry/92970 (last

---

[6] "Land or other natural resources" is a defined term in both MIA and MICSA that explicitly includes water. See Me. Rev. Stat. Ann. tit. 30, § 6203(3); 25 U.S.C. § 1722(b).

- 13 -

visited Jan. 14, 2021) (defining "in" to mean "[o]f position or location").

MIA's use of the word "solely" in the Reservation's definition also precludes any interpretation of § 6203(8) that includes the River's submerged lands or its waters. The Reservation includes "solely . . . Indian Island . . . and all islands in [the River] northward thereof . . . ." Me. Rev. Stat. Ann. tit. 30, § 6203(8). We have already explained why an "island" plainly does not include its surrounding waters or submerged lands. Because the Reservation's definition excludes any definition that is not stated, see Burgess v. United States, 553 U.S. 124, 130 (2008), because it does not say that it includes the River or its submerged lands, and because the Supreme Court has said that "'[s]olely' means 'alone,'" Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833, 1842 (2018), and that "'[s]olely' leaves no leeway" for anything more, Helvering v. Sw. Consol. Corp., 315 U.S. 194, 198 (1942), the Reservation includes only the specified islands and not the Main Stem of the River or its submerged lands.[7]

---

[7] Because MIA's definition of Reservation clearly includes only the islands, we reject the United States' alternative argument that that the Reservation extends from the islands to the thread of the River. There is no support in the text for this reading.

We also reject the Nation and United States' argument that state common law informs the definition of Reservation. The text of the Settlement Acts does not allow us to use state common law in interpreting the Acts' definitional provisions.

- 14 -

The Nation and the United States argue that Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918), controls this case. More than a century ago, in Alaska Pacific, the Supreme Court interpreted the phrase "the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska" used in an 1891 statute establishing an Indian reservation. Id. at 86 (quoting Act of March 3, 1891, ch. 561, § 15, 26 Stat. 1095, 1101). It held that "the geographical name was used, as is sometimes done, in a sense embracing the intervening and surrounding waters as well as the upland -- in other words, as descriptive of the area comprising the islands." Id. at 89. In reaching this conclusion, the Court relied on the statute's plain text, legislative history, and the Indian canon of construction that "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Id.

The Court found that the phrase "body of lands known as the Annette Islands" at issue in Alaska Pacific was ambiguous and had no plain meaning. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 548 n.14 (1987) ("There is no plain meaning to 'the body of lands' of an island group." (citing Alaska Pacific, 248 U.S. at 89)). As the Court explained in a later case, "body of lands" is ambiguous because it has no precise geographic meaning. Id. (stating that "body of lands" "did not have [a] precise

- 15 -

geographic/political meaning[] which would have been commonly understood[] without further inquiry" (citing Alaska Pacific, 248 U.S. at 89)). It was unclear if the water between the lands was part of the "body." To resolve the ambiguity, the Court relied on legislative history. Alaska Pacific, 248 U.S. at 89.

There is no ambiguity here, and so for that and other reasons Alaska Pacific does not help the Nation, the United States, or the dissent. A recent ruling by the Supreme Court involving the boundaries of an Indian reservation has confirmed that reliance on legislative history is only appropriate when a statute is ambiguous. McGirt v. Oklahoma, 140 S. Ct. 2452, 2469 (2020) ("There is no need to consult extratextual sources when the meaning of a statute's terms is clear."). Similarly, Alaska Pacific only relied on an Indian canon that resolves "doubtful expressions" in favor of Indian tribes because there was an ambiguity. 248 U.S. at 89. When it was decided in 1918, Alaska Pacific did not establish a special rule of construction when tribes' claims involve water rights. It certainly did not establish a special rule of construction meant to govern a different statute enacted for a different purpose a century later. Indeed, the Court has repeatedly recognized that in its past cases "address[ing] the unique circumstances of Alaska and its indigenous population," "[t]he 'simple truth' . . . is that 'Alaska is often the exception, not the rule.'" Yellen v. Confederated Tribes of Chehalis Rsrv.,

No. 20-543, 2021 WL 2599432, at *3 (U.S. June 25, 2021) (quoting Sturgeon v. Frost, 577 U.S. 424, 440 (2016)). The general rule applicable to statutes is, as the Supreme Court recently reinforced, that the "inquiry into the meaning of [a] statute's text ceases when 'the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" Matal v. Tam, 137 S. Ct. 1744, 1756 (2017) (quoting Barnhart, 534 U.S. at 450).

As we have explained, the definition of Reservation in the Settlement Acts is not ambiguous. It does not refer to a nebulous "body of lands." Instead, it says the Reservation consists "solely" of islands "in the Penobscot River." Me. Rev. Stat. Ann. tit. 30, § 6203(8). The word "islands" has a plain and precise geographic meaning, "solely" tells us that the Reservation includes nothing else, and the phrase "in the Penobscot River" specifies where the islands are. The fact that the Supreme Court interpreted different language in a different statute that was not a settlement act to reach a different result cannot be used to create ambiguity in this statute. See McGirt, 140 S. Ct. at 2469 ("The only role [extratextual sources] can properly play is to help 'clear up . . . not create' ambiguity about a statute's original meaning." (quoting Milner v. Dep't of Navy, 562 U.S. 562, 574 (2011))). For similar reasons, the Nation and United States'

citations to Hynes v. Grimes Packing Co., 337 U.S. 86 (1949),[8] Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970),[9] and other cases interpreting different language in different treaties or statutes in different contexts are also unconvincing.

The Nation and the United States next argue that our holding in Maine v. Johnson conflicts with our reading of Reservation. Johnson addressed whether the Settlement Acts

---

[8] The dissent relies on Hynes to muddy the waters. There, the Supreme Court interpreted the statutory phrase "any other public lands which are actually occupied by Indians or Eskimos within [the Territory of Alaska]" to include coastal waters for purposes of authorizing the Secretary of the Interior to designate such territory as part of an Indian reservation. 337 U.S. at 110-16. It considered a number of extratextual factors in reaching that conclusion. Id. As the Court later clarified, it did so because that statutory phrase "did not have [a] precise geographic/political meaning[] which would have been commonly understood, without further inquiry, to exclude the waters," nor did the narrower phrase "'public lands,' in and of itself, ha[ve] a precise meaning." Amoco Prod., 480 U.S. at 548 nn.14-15. Hynes does nothing to dispel the fact that the term "lands" in isolation ordinarily excludes water, see, e.g., Hynes, 337 U.S. at 102 (referring to the "lands or waters" of a reservation), and that additional definitional or qualifying language is required for it to encompass water. The term "lands" in the context of MICSA's definition of the Reservation stands alone, and its incorporation by reference of MIA's definition of the Reservation as consisting "solely" of specified islands "in" water indicates that it should retain its ordinary meaning.

[9] In Choctaw Nation, the language at issue was very different from the language in the definition of Reservation. The Court found the language ambiguous because it granted the Choctaw Nation land "up the Arkansas [River]" and "down the Arkansas [River]." 397 U.S. at 631. Additionally, unlike here, the Court was interpreting a treaty and applied the canon of construction interpreting "treaties with the Indians . . . as they would have understood them." Id.

- 18 -

reserved to the Nation and the Passamaquoddy Tribe "authority (vis-à-vis the State) to regulate pollution by non-Indians within the tribes' territories." 498 F.3d at 41. The court held that they did not. Id. at 45-47. In doing so, it explicitly refused to decide the boundaries of the tribes' territories. See id. at 40 n.3 ("The territorial boundaries are disputed but, for purposes of this case, we assume (without deciding) that each of the disputed discharge points lies within the tribes' territories."); id. at 45 (describing "navigable waters within what we assume to be tribal land"). The Nation and United States point to dicta in Johnson where the court said "the facilities appear . . . to discharge onto reservation waters retained by the tribes under the Settlement Act." But in citing this dicta, they ellipt the court's parenthetical explaining that it was not resolving any boundary disputes. Id. at 47 ("[T]he facilities appear (even assuming the tribes' boundary claims) to discharge onto reservation waters retained by the tribes under the Settlement Act." (first emphasis added)). Any dicta about boundaries in Johnson cannot alter the plain meaning of Reservation and does not bind us. See Municipality of San Juan v. Rullan, 318 F.3d 26, 28 n.3 (1st Cir. 2003) ("Dicta -- as opposed to a court's holdings -- have no binding effect in subsequent proceedings in the same (or any other) case.").

The Nation, United States, and dissent also say that Maine's arguments to us in its brief in Johnson are a concession that the Nation's Reservation contains the Main Stem in its entirety. Not so, either on a reading of that brief or under the law. In a recent dispute related to the boundaries of an Indian reservation, the Supreme Court confirmed that a party's prior litigation position on a reservation's boundaries in a single case does not concede the point in future cases. See McGirt, 140 S. Ct. at 2473 n.14 (rejecting the dissent's reliance on "a single instance in which the Creek Nation disclaimed reservation boundaries for purposes of litigation"); see also Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (outlining the doctrine of judicial estoppel, which requires that "the estopping position and the estopped position . . . be directly inconsistent" and that "the responsible party . . . have succeeded in persuading a court to accept its prior position"). In a footnote of a brief that it submitted in Johnson, Maine stated that it was its "position that the Penobscot Reservation includes those islands in the main stem above and including Indian Island that have not otherwise been transferred, as well as the usual accompanying riparian rights that likewise have not been transferred, and that those riparian rights are subject to state regulation." Brief of State of Maine as Intervenor-Respondent at 3 n.2, 498 F.3d 37 (Nos. 04-1363, 04-1375). It went no further

than this.  Maine did not explain what it understood to be the sort of riparian rights that would "usual[ly] accompany[]" an island reservation, and it is unclear whether it was asserting that none of those rights had "been transferred" or that the Reservation retained only those rights that had not been transferred.  Nor did it explain to what extent those rights were "subject to state regulation."  In any case, the Johnson court did not adopt any version of Maine's statement and that issue was not before it.  Maine's past arguments in Johnson cannot override the Settlement Acts' plain text.

2. The Definition of Reservation Is Not Altered by the Limitation of the Reservation to Islands as Earlier Described in Historic Treaties Between the Nation and Massachusetts and Maine.

   The Nation, United States, and dissent argue that, when construing the definition of Reservation in the Settlement Acts, we must look to the Nation's past treaties with Massachusetts and Maine.  They say that because § 6203(8) describes the islands in the Reservation as those "reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine," Me. Rev. Stat. Ann. tit. 30, § 6203(8), these past treaties govern what "island" means in the Settlement Acts.[10]  They argue that "island"

---

[10]    The 1796 treaty between the Nation and Massachusetts says that the Nation gave up their rights to "all the lands on both sides of the River Penobscot" but reserved "all the Islands in said River, above Old Town, including said Old Town island." The 1818 treaty reaffirmed the Nation's 1796 surrender of land on

does not carry its ordinary meaning but instead is a term of art that means "anything reserved to the Nation by the 1796 and 1818 treaties." They make the disputed assertion that the Nation never gave up any rights to the River in those treaties and from this they conclude that the term Reservation must include the River. To support this reading of § 6203(8), the Nation cites § 1723 of MICSA, which it says extinguished the Nation's aboriginal title only to lands it transferred, and the House and Senate Reports, which say that "[t]he Penobscot Nation will retain as reservations those lands and natural resources which were reserved to them in their treaties with Massachusetts and not subsequently transferred by them." S. Rep. No. 96-957 at 18 ("Senate Report"); H.R. Rep. No. 96-1353 at 18 ("House Report").

MIA's reference to these treaties does not alter the plain meaning of "islands" and creates no ambiguity. The phrase "islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine" is not a term of art. See Confederated Tribes of Chehalis Rsrv., 2021 WL 2599432, at *7 (refusing to "discard the plain meaning of [a statute's] 'Indian tribe' definition in favor of a term-of-art

---

both sides of the River and the reservation of certain islands in the River to the Nation. It also gave the citizens of Massachusetts "a right to pass and repass any of the rivers, streams, and ponds which run through any of the lands hereby reserved."

construction" because the statutory context did not support such a reading). MIA mentions the treaties to identify which islands in the River are part of the Reservation. The Reservation includes the "islands in the Penobscot River," minus any islands that were not "reserved to the Penobscot Nation by agreement with [Massachusetts and Maine]." Me. Rev. Stat. Ann. tit. 30, § 6203(8). Within this subset of islands, MIA further limits the Reservation: it "consist[s] solely of Indian Island" and the islands north of Indian Island "that existed on June 29, 1818," minus any island "transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act." Id.

The dissent states that this interpretation of Reservation treats the phrase "reserved to the Penobscot Nation by agreement" "as if it were superfluous." Not so. The phrase "reserved to the Penobscot Nation by agreement" serves an important purpose: it makes the definition of Reservation consistent with § 1723 of MICSA. If the phrase "reserved . . . by agreement" were removed from the definition, then the Reservation would plainly include any islands in the River north of Indian Island that were transferred before June 29, 1818 but never reserved by agreement.[11]

_____

[11] This is so because § 6203(8) only excludes islands transferred "subsequent to June 29, 1818" (emphasis added), the date of a treaty between the Nation and Massachusetts, from the Reservation. Without the reference to islands "reserved . . . by

Such a definition would conflict with 25 U.S.C. § 1723, which ratified all transfers the Nation made before December 1, 1873. See Van Buren v. United States, 141 S. Ct. 1648, 1656 (2021) (holding that statutory text is not superfluous where removing it changes a statute's meaning).

The dissent's interpretation of § 6203(8), independent of its flawed account of the history and meaning of the treaties, is inconsistent with the applicable rules of statutory interpretation. Its reading of Reservation would render superfluous other language in the definition. If the dissent were correct that the Nation reserved "all the islands in the Penobscot [R]iver above Oldtown and including . . . Oldtown [I]sland" in its 1818 treaty with Massachusetts and that the Settlement Acts intended to import this meaning into the definition, then the statutory phrase "consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof" would serve no purpose. The canon against surplusage counsels against such an interpretation.[12] See City of Chicago v.

---

agreement," the definition would say nothing about pre-1818 transfers.

[12] Removing the superfluous language, the statutory definition would read: "'Penobscot Indian Reservation' means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine that existed on June 29, 1818 . . . ." Even after almost all of the "consisting" phrase is removed, the definition would still make clear that post-1818 islands are not part of the Reservation.

Fulton, 141 S. Ct. 585, 591 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." (quoting Yates v. United States, 574 U.S. 528, 543 (2015))).

The dissent's proposed reading would also make other parts of § 6203(8) inoperative. The definition says that the Reservation includes "all islands" north of Indian Island "that existed on June 29, 1818." If, as the dissent posits, the Settlement Acts intended the Reservation to include the entire Main Stem by referencing the treaties, then anything in the Main Stem north of Indian Island would be read to be part of the Reservation. Under the dissent's reading, this would be true regardless of whether the land was submerged on June 29, 1818. The phrase "that existed on June 29, 1818" would be redundant and would have no meaning under the dissent's interpretation. Further, the inclusion of the phrase reinforces that "islands" means only the uplands.

In attempt to avoid these evident problems with its interpretation, the dissent proposes that the "consisting solely of . . ." phrase was included to clarify that the Reservation includes the entire Main Stem, including Indian Island and all of the islands north of Indian Island, minus any uplands in the river that did not exist on June 29, 1818. This proposed reading by the dissent is impermissible for a different reason: it requires the

word "islands" to have two different meanings within the definition of Reservation. Under the dissent's proposed reading, when "islands" is used in the phrase "islands in the Penobscot River," it must mean "an area that includes waters." Then, when "islands" is used later in the same sentence in the nearly identical phrase "all islands in that river," it must mean "uplands alone."[13] That proposed reading is flatly at odds with the text. It also would violate the "normal rule of statutory construction that 'identical words used in different parts of the same act are intended to have the same meaning.'" See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (quoting Sorenson v. Sec'y of Treasury, 475 U.S. 851, 860 (1986)). This rule is "surely at its most vigorous when a term is repeated within a given sentence." Brown v. Gardner, 513 U.S. 115, 118 (1994) (stating that, given the "presumption that a given term is used to mean the same thing throughout a statute," it would be "virtually impossible" to read a statute in a way that would give a word two different meanings in the same sentence); cf. Mohamad v. Palestinian Auth., 566 U.S. 449, 456 (2012) ("[I]t is difficult indeed to conclude that Congress employed the term 'individual' four times in one sentence to refer to a natural person and once to refer to a natural person and any nonsovereign

---

[13] The dissent does not appear to dispute that, in the phrase "all islands in that river" in § 6203(8), the word "islands" must mean "uplands only."

- 26 -

organization."). The dissent's reading is "implausible in context." Confederated Tribes of Chehalis Rsrv., 2021 WL 2599432, at *11.

Our reading of § 6203(8)'s reference to the treaties is also consistent with how MIA defines the Passamaquoddy Indian Reservation. That definition similarly begins by referencing a treaty, saying that the Passamaquoddy Indian Reservation "means those lands reserved to the Passamaquoddy Tribe by agreement with the State of Massachusetts dated September 19, 1794." Me. Rev. Stat. Ann. tit. 30, § 6203(5). It then says that "[f]or the purposes of this subsection, the lands reserved to the Passamaquoddy Tribe by the aforesaid agreement shall be limited to" various islands and parcels. Id. (emphasis added). Like in the definition of Penobscot Indian Reservation, the agreement is referenced to limit which islands the reservation includes. Also like in the definition of Penobscot Indian Reservation, the islands referenced in the treaty are then further restricted to mean less than what the treaty reserved for the tribe. The definition of Reservation accomplishes this restriction by using the word "solely," while the definition of Passamaquoddy Indian Reservation does so by saying "shall be limited to." The fact that the drafters clearly intended the Passamaquoddy Indian Reservation to cover less than what was reserved to the Passamaquoddy Tribe in its agreement with Massachusetts undercuts the dissent's theory that,

when defining Penobscot Indian Reservation, "the drafters of the Settlement Acts intended in defining the 'Reservation' to preserve what had been 'reserved . . . by agreement' prior to the Acts' passage."

There is no plausible argument that the historic treaties referenced in § 6203(8) govern the interpretation of the Settlement Acts. The treaties no longer have any meaning independent of the Settlement Acts, and MICSA is clear that Maine no longer has any responsibilities to the Nation under the treaties. 25 U.S.C. § 1731 ("[This Act] shall constitute a general discharge and release of all obligations of the State of Maine . . . arising from any treaty or agreement with, or on behalf of any Indian nation.").

Even if the treaties could arguably be thought to induce any ambiguity in § 6203(8), we reach the same conclusion. When the text of a statute is ambiguous, we resolve the ambiguity by looking to other evidence of the drafters' intent. Carnero v. Bos. Sci. Corp., 433 F.3d 1, 7 (1st Cir. 2006) ("In searching for clear evidence of Congress's intent, courts consider 'all available evidence' about the meaning of the statute."); see Robinson, 519 U.S. at 345-46. Here, the legislative history, context, and purpose of the Settlement Acts show that the drafters never intended the Reservation to include the River itself.

Before the Settlement Acts were passed, Massachusetts, then Maine, had exercised regulatory authority over the River for more than a century. Massachusetts regulated the River before its 1818 treaty with the Nation. See 1810 Mass. Laws ch. LXXXVIII (outlining penalties for obstructing the River or taking fish from it outside of approved times) ; 1813 Mass. Laws ch. CXLIV (same); 1816 Mass. Laws ch. XCIX (providing for the appointment of fish wardens for the River). After the 1818 treaty, once Maine separated from Massachusetts and became a state in 1820, it regulated the River in Massachusetts's stead. See 1843 Me. Laws ch. 25 (providing for the appointment of fish wardens to supervise fisheries in the River).

Massachusetts and Maine also conveyed parcels along the Main Stem, including adjacent submerged lands, to municipalities and private parties in publicly recorded deeds. These entities relied on the title given to them by Maine and Massachusetts. They used the Main Stem and built on its submerged lands. For example, several dams were constructed in and adjacent to the Main Stem beginning in the 19th and 20th centuries. See, e.g., Penobscot Chem. Fibre Co., 30 F.P.C. 1465, 1465-66 (1963) (describing the Great Works Dam, which was "built prior to 1900"); Bangor Hydro-Elec. Co., 42 F.P.C. 1302, 1302 (1969) (describing two dams in the Main Stem which were acquired in 1925). The Nation admits that it did not execute leases or grant any interest in connection with

any of these dams. As amended in 1988, § 6203(8) even mentions the owner of some of these dams, Bangor-Pacific Hydro Associates. It says that the Reservation includes certain "parcels of land that have been or may be acquired by [the Nation] from [Bangor-Pacific] as compensation for flowage of reservation lands by the West Enfield dam." Notably, the compensation is only for flowage.[14] It is not for building a dam on the submerged lands of the Main Stem.

The Settlement Acts' stated intention was to resolve outstanding disputes among the Nation, Maine, and parties represented by the State Intervenors. The Settlement Acts were passed after the Nation, along with two other tribes, claimed title to two-thirds of Maine, an area "on which more than 250,000 private citizens now reside." Senate Report at 11; House Report at 11. In response to these claims, President Carter appointed retired Georgia Supreme Court Justice William B. Gunter to recommend a settlement. Senate Report at 13. Gunter's recommendation to the President, which served as the basis for the Settlement Acts and which is included in the Senate Report, explained that the Nation's claims had caused "economic stagnation within the claims area" and

---

[14] "Flowage" is "an overflowing onto adjacent land" or "a body of water formed by overflowing or damming." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/flowage (last visited Jan. 25, 2021) (first and second definition).

had resulted in "a slow-down or cessation of economic activity because property cannot be sold, mortgages cannot be acquired, title insurance becomes unavailable, and bond issues are placed in jeopardy." Id. at 55. Justice Gunter wrote that "[w]ere it not for this adverse economic result, these cases could take their normal course through the courts, and there would be no reason or necessity" for President Carter to take any action to facilitate a settlement. Id. He ultimately recommended a settlement with terms similar to those in MIA and MICSA. Id. at 56. However, emphasizing the need to address the economic consequences of the Nation's land claims and settle the land disputes, he wrote that "Congress should immediately extinguish all aboriginal title, if any, to all lands within the claims area except that held in the public ownership by the State of Maine" if a settlement could not be reached. Id. at 57.

The text of MICSA explicitly incorporates Justice Gunter's concern about avoiding litigation and clarifying title to land in Maine. It states MICSA's purpose is to "to remove the cloud on titles to land in [Maine] resulting from Indian Claims" and "to clarify the status of other land and natural resources in [Maine]." 25 U.S.C. § 1721(b)(1)-(2). Other parts of the House and Senate Reports on MICSA further support the idea that the Settlement Acts were passed to avoid litigation in which "the court would be required to decide questions of fact concerning events

which began before this country was founded." Senate Report at 13; House Report at 12-14.

A key provision of the Settlement Acts, § 1723 of MICSA, helped Congress achieve this purpose. Through § 1723, Congress retroactively ratified "any transfer of land or natural resources located anywhere within the State of Maine" made by any Indian tribe, including the Nation. 25 U.S.C. § 1723(a)(1). "Transfer" is defined extremely broadly[15] and includes "any act, event, or circumstance that resulted in a change of title to, possession of, dominion over, or control of land or natural resources." Id. § 1722(n). The Settlement Acts also extinguished aboriginal title to any land or natural resources the Nation transferred and barred the Nation from making claims "based on any interest in or right involving such land or natural resources." Id. § 1723(c). Through this provision, Congress intended to extinguish all of the Nation's land claims in Maine. See House Report at 18 ("[Section 1723] provides for the extinguishment of the land claims of the . . . the Penobscot Nation . . . in the State of Maine.").

Maine and the Nation "each . . . benefitted from the settlement." Akins v. Penobscot Nation, 130 F.3d 482, 484 (1st

---

[15]     The Senate Report says that the word "transfer" covers "all conceivable events and circumstances under which title, possession, dominion, or control of land or natural resources can pass from one person or group of persons to another person or group of persons." Senate Report at 21.

Cir. 1997). Indeed, the Nation benefited greatly. It largely received "the powers of a municipality under Maine law." Id.; see Me. Rev. Stat. Ann. tit. 30, § 6206. The settlement "confirmed [the Nation's] title to designated reservation lands, memorialized federal recognition of its tribal status, and opened the floodgate for the influx of millions of dollars in federal subsidies." Akins, 130 F.3d at 484 (quoting Passamaquoddy Tribe v. Maine, 75 F.3d 784, 787 (1st Cir. 1996) (alteration in original)). It also established two multi-million-dollar trusts for the Nation: (1) a $26.8 million trust to buy land and (2) a $13.5 million trust whose income is paid quarterly to the Nation. See 25 U.S.C. § 1724(a)-(d); Penobscot Nation v. Stilphen, 461 A.2d 478, 487 n.6 (Me. 1983) (describing the trusts). Indeed, the Native American Rights Fund, which represented the Nation in its land claim cases before the Settlement Acts were passed, said shortly after the settlement that "[t]he Maine settlement is far and away the greatest Indian victory of its kind in the history of the United States." See Penobscot Nation, 151 F. Supp. 3d at 196.

Discounting the history of the Settlement Acts themselves, the dissent tells a one-sided story about the importance of the River to the Nation, details the various treaties the Nation entered into, and speculates about the Nation's understanding of those treaties and how they must have reserved the River for the Nation. It ends its history in the early 1800s,

- 33 -

saying that it is this history that "formed the backdrop for the Settlement Acts." It also relies on "post-enactment history of the Settlement Acts" to reinforce its understanding, something the Supreme Court has specifically counseled against. See McGirt, 140 S. Ct. at 2452 ("[E]vidence of the subsequent treatment of the disputed land . . . has 'limited interpretive value.'" (quoting Nebraska v. Parker, 136 S. Ct. 1072, 1082 (2016))); see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 356 (1998) (calling post-enactment history the "least compelling" form of evidence). It insists without textual support that the Settlement Acts "were intended in significant part to make up for the fact that the Nation had entered into . . . treaties . . . without . . . federal authorization" in violation of the Nonintercourse Act.

The dissent's view of history is disputed,[16] and, regardless, beside the point. The record does not support the contention that the drafters were motivated by anything other than their stated purpose of "remov[ing] the cloud on the titles to land in the State of Maine resulting from Indian claims." 25 U.S.C. § 1721(b)(1). They removed this cloud and settled all of the Nation's claims by giving the Nation certain land, power, recognition, and money. As we have recounted, the Settlement Acts'

---

[16] For example, the State Intervenors argue that the Nation's aboriginal title to the River was extinguished by the Nation's 1713 treaty with Great Britain, the Treaty of Portsmouth.

- 34 -

drafters wanted to avoid expensive, protracted litigation about aboriginal title. They did not want courts to decide if, when, or how the Nation's aboriginal title was extinguished by interpreting centuries-old documents. And, as they stated explicitly, they did not want the Nation's claims of aboriginal title rooted in these treaties to muddy otherwise-valid title to lands or natural resources in Maine.

Interpreting § 6203(8)'s reference to the treaties as a resurrection of the Nation's claim to aboriginal title contravenes all of these purposes. The dissent would have us undo MIA and MICSA's settlement of all ownership disputes. But "[w]e cannot interpret . . . statutes to negate their own stated purposes." King v. Burwell, 576 U.S. 473, 493 (2015) (quoting N.Y. State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 419-20 (1973)). It is implausible that the drafters intended to give the Nation exclusive control of the Main Stem -- something it did not have in 1980 -- through a reference (which serves a different purpose) to long-since-replaced historic treaties.[17] This is especially so when the

---

[17] The legislative history of the Settlement Acts provides even more evidence that the Reservation does not include the River. In background information provided to the House Committee on Interior and Insular Affairs, the Reservation was described as "a 4,000-acre reservation on a hundred islands in the Penobscot River." Settlement of Indian Land Claims in the State of Maine: Hearing on H.R. 7919 Before the Comm. on Interior and Insular Affairs, 96th Cong. 159 (1980) (background on H.R. 7919). If the Reservation included the entirety of the Main Stem, bank-to-bank, it would have had a surface area of approximate 13,760 acres.

Settlement Acts released Maine from any obligation under those same treaties, abolished the Nation's aboriginal title to anything it ever voluntarily or involuntarily transferred, and purported to settle all of the Nation's land and natural resource claims against Maine and private parties.

Further, it is noteworthy that the Settlement Acts' text and legislative history clearly indicate that the drafters did not intend to give control of the Main Stem to the Nation. Doing so would have been an enormous change. The River is an important water artery that Maine (and Massachusetts before it) has controlled for centuries.[18] When the Settlement Acts were drafted and passed, the Nation's claim to the River and other lands or natural resources in Maine was speculative. If the drafters had intended to shift Maine's longstanding ownership and control of the Main Stem to the Nation, we would expect to see language in the Settlement Acts' text or legislative history demonstrating this intent and addressing the consequences of doing so. See, e.g., Me. Rev. Stat. Ann. tit. 30, § 6207(3) (explicitly providing for "an orderly transfer of regulatory authority" between Maine

---

[18] As the State Intervenors put it, "it defies credulity that in 1980, after almost two hundred years of State control, the Settlement Acts would place the largest river running through the heart of the state, used by myriad mills, municipalities, and the public, within the boundaries of the Reservation, to be regulated, for the first time since colonists arrived, by the Nation." (internal citations omitted).

and the Maine Indian Tribal-State Commission over specified bodies of water); id. § 6207(6) (describing procedures by which Maine's Commissioner of Inland Fisheries and Wildlife may intervene in the event that "a tribal ordinance or commission regulation . . . adversely affect[s] or is likely to adversely affect the stock of any fish or wildlife on lands or waters outside the boundaries of land or waters subject to [tribal or commission authority]"). But we see none. It is improbable that, without addressing the issue, the drafters intended to carry out such a massive change in ownership and control over the Main Stem.

The dissent tries to limit the practical consequences of its argument by saying that "the Nation has not . . . claimed a right to exclude non-tribal members from any of the waters of the Penobscot River or to control passage in those waters." It calls the State Defendants' and State Intervenors' arguments about ownership a "distraction." The idea that the Nation only seeks to assert limited ownership rights in the River is purely speculative and contrary to the record. In its original complaint,[19] the Nation

---

[19] These statements do not appear in the Nation's second amended complaint, and the Nation's brief to the original panel says that the second amended complaint "is narrowly drawn to address the only live controversy." However, in that same brief, the Nation argues that "it retains aboriginal title to the submerged lands of the Main Stem." It describes aboriginal title as "not identical to ownership" but, quoting Oneida County v. Oneida Indian Nation of New York, 470 U.S. 226, 235 (1985), "as sacred as the fee simple of the whites." Black's Law Dictionary describes "fee simple" as "the broadest property interest allowed

- 37 -

asserted that it "never intended to relinquish its ownership rights within the Penobscot River" and argued that Congress "inten[ded] that the Nation's reservation encompass ownership rights within and attending the Penobscot River."  It asked for a declaratory judgment that it has "exclusive authority to regulate hunting, trapping or other taking of wildlife within the waters of the Main Stem" and that its "law enforcement officers have exclusive authority to enforce the Nation's laws governing hunting, trapping or other taking of wildlife within the waters of the Main Stem." And it has previously sued a non-tribal member who removed submerged logs from the River in tribal court for "trespass to tribal land" and "unlawful taking of tribal resources." Penobscot Nation v. Coffman, No. 7-31-03-CIV-04, slip op. at 4 (Penobscot Tribal Ct. Mar. 2, 2005).  The tribal court, invoking a version of the treaty argument, held that the River is part of the Reservation.  Id. at 3.  The tribal court then held that MIA "does not limit or define the tribal court's jurisdiction" and that the Supreme Court "has recognized that tribal courts retain jurisdiction over [civil] disputes arising on a reservation."  Id. at 2.  Because the Nation "retains aboriginal ownership of the

_____

by law."  Black's Law Dictionary 760 (11th ed. 2019).  In its brief to the original panel, the United States says that the Nation has an "ownership interest" in its Reservation and that "[i]t is unnecessary to determine whether the Nation's ownership interest in the land it has retained is best characterized as aboriginal title . . . ."

Penobscot River, from bank to bank, limited only by the right of the public to use the river for navigation," the tribal court held that the Nation could successfully sue the non-tribal member and stated that "there is no right granted to an individual to conduct any . . . enterprise [other than the "limited public easement to pass up and down the river for the purpose of commercial transportation"] without tribal permission." Id. at 3-4. The stakes of reading the definition of Reservation to include the River are far greater than the dissent is willing to acknowledge.

3. The Indian Canons of Construction Do Not Alter the Settlement Acts' Plain Meaning or Override Clear Expressions of Tribal and Legislative Intent.

The Nation and the United States next argue that three Indian canons apply to this case. None of these canons alter the plain meaning of the Reservation's definition.[20]

The first canon they cite says that "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." See County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269 (1992) (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985) (alteration in original)). This canon only applies to

_____

[20] The State Defendants and State Intervenors argue that § 1725(h) and § 1735(b) of MICSA bar the application of any Indian canons of construction. Because we hold that the Indian canons are inapplicable for other reasons, we do not reach this issue.

ambiguous provisions. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist."); Littlefield v. Mashpee Wampanoag Indian Tribe, 951 F.3d 30, 40 (1st Cir. 2020). As we have explained, the definition of Reservation in the Settlement Acts is not ambiguous. And even if the definition of Reservation were ambiguous and the canon applied, interpreting ambiguities to benefit the tribe does not mean that we must "disregard clear expressions of tribal and congressional intent." DeCoteau v. Dist. Cnty. Ct., 420 U.S. 425, 445 (1975) (finding the canon did not support a tribe's interpretation of a statute when "the 'face of the Act,' and its 'surrounding circumstances' and 'legislative history,' all point[ed] unmistakably" to a different interpretation); see also Yankton Sioux Tribe, 522 U.S. at 349; Catawba, 476 U.S. at 506–07; Ore. Dep't of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 774 (1985); Rice v. Rehner, 463 U.S. 713, 732-33 (1983); Andrus v. Glover Constr. Co., 446 U.S. 608, 618-19 (1980). The context, history, and purpose of the Settlement Acts point unmistakably to an interpretation of the Reservation that excludes the Main Stem.

Next, they cite the Indian treaty canon: "Indian treaties 'must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians." Herrera

v. _Wyoming_, 139 S. Ct. 1686, 1699 (2019) (quoting _Minnesota_ v. _Mille Lacs Band of Chippewa Indians_, 526 U.S. 172, 206 (1999)); _Jones_ v. _Meehan_, 175 U.S. 1, 11 (1899) (stating that treaties must be construed "in the sense in which they would naturally be understood by the Indians").  But the Settlement Acts are not treaties.  See _Aroostook Band of Micmacs_, 484 F.3d at 53 (refusing to apply "rules of statutory construction favoring Indians" applicable to treaties because interpreting MICSA "does not involve any treaty").  They are statutes.  The treaty canon has no bearing on their interpretation.

Finally, they cite the Indian canon saying that Congress's intent to diminish a reservation must be clear.  See _Parker_, 136 S. Ct. at 1078-79 ("'[O]nly Congress can divest a reservation of its land and diminish its boundaries,' and its intent to do so must be clear." (quoting _Solem_ v. _Bartlett_, 465 U.S. 463, 470 (1984))); _United States_ v. _Santa Fe Pac. R.R. Co._, 314 U.S. 339, 345-46 (1941).  This is not a traditional diminishment case, as the United States admits in its brief to us, making the canon inapplicable.  Regardless, the text of the Settlement Acts makes Congress's intent clear.  "The most probative evidence of congressional intent [to change a reservation's boundaries] is the statutory language used." _Solem_, 465 U.S. at 470.  The "unconditional commitment from Congress to compensate the Indian tribe for its opened land" creates "an almost

- 41 -

insurmountable presumption that Congress meant for the tribe's reservation to be diminished." Id. at 470-71; see also McGirt, 140 S. Ct. at 2468 ("When interpreting Congress's work in [a diminishment case], no less than any other, our charge is usually to ascertain and follow the original meaning of the law before us."). As we have stated, the statutory language defining the Reservation makes it clear that Congress did not intend to include the River or submerged lands as part of the Reservation. Congress also agreed to put $13,500,000 into the Maine Indian Claims Settlement Fund and $26,800,000 into the Maine Indian Claims Land Acquisition Fund for the benefit of the Nation. 25 U.S.C. § 1724(a), (c). Congress intended these funds to compensate the Nation for giving up any claims to the land or natural resources not included in the Settlement Acts' definition of Reservation. See Me. Rev. Stat. Ann. tit. 30, § 6203(12) (defining "Settlement Fund" as "the trust fund established for the . . . Penobscot Nation by the United States pursuant to congressional legislation extinguishing aboriginal land claims in Maine"). Indeed, MICSA forbids the Secretary of the Interior from using settlement fund money for the benefit of the Nation unless the Nation has "executed appropriate documents relinquishing all claims to the extent provided by sections [of this Act approving prior transfer and discharging Maine from all obligations arising from any treaties or agreements with the Nation]." 25 U.S.C. § 1724(f). Congress

intended the Settlement Acts to "provide the . . . Nation . . . with a fair and just settlement of their land claims," id. § 1721(a)(7), and "clarify the status of other land and natural resources in the state of Maine," id. § 1721(b)(2), so any diminishment was intended.

4. The Nation's Reading of Reservation Makes Other Parts of the Settlement Acts Incoherent and Inconsistent.

Adopting the Nation and United States' reading of "Penobscot Indian Reservation" would make other parts of the Settlement Acts incoherent and inconsistent. See Robinson, 519 U.S. at 341. One section of MIA dealing with regulatory takings of land within the Reservation says that "[f]or purposes of this section, land along and adjacent to the Penobscot River shall be deemed to be contiguous to the Penobscot Indian Reservation." Me. Rev. Stat. Ann. tit. 30, § 6205(3)(A). This statutory language makes it clear that, outside of § 6205(3)(A), land along and adjacent to the River is not contiguous to the Reservation. If land along and adjacent to the River is not contiguous to the Reservation, then the Reservation cannot possibly include the River itself. To interpret it otherwise would render § 6205(3)(A)'s language superfluous, something we must avoid. See

City of Chicago, 141 S. Ct. at 91; Nielsen v. Preap, 139 S. Ct. 954, 969 (2019).

Next, other provisions of the Settlement Acts explicitly address water, water rights, and submerged lands using different and more specific language. Reading "Penobscot Indian Reservation" to include these things when they are not mentioned anywhere in the definition would make the Settlement Acts inconsistent. For example, the Settlement Acts define the phrase "land or other natural resources" -- not simply "land" -- to include "water and water rights." 25 U.S.C. § 1722(b); Me. Rev. Stat. Ann. tit. 30, § 6203(3). Equating "land" with "land or other natural resources" in MICSA's definition of Reservation collapses this difference. See 25 U.S.C. § 1722(i) (defining the Reservation to include "lands," not "lands or other natural resources"). Another section of the Settlement Acts, Me. Rev. Stat. Ann. tit. 30, § 6207, shows that the drafters knew how to say "lands or waters" when that is what they intended. See Me. Rev. Stat. Ann. tit. 30, § 6207(5)-(6) (using "lands or waters" instead of "lands").

MIA also addresses the Nation's authority to regulate "any pond in which all the shoreline and all submerged lands are wholly within Indian territory." Id. § 6207(1)(B) (emphasis added). Penobscot Indian Territory is a defined term distinct from Penobscot Indian Reservation. There is no reference in the

Settlement Acts to any submerged lands in the Reservation, and the use of "submerged lands" in § 6207(1)(B) is the only time the phrase is used. Like their use of "land or other natural resources" and "lands or waters" in other parts of MIA and MICSA, the drafters knew how to -- and did -- include more than land when they wanted to do so. Cf. Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 416 (2012) ("[I]f we needed any proof that Congress knew how to say [a phrase] when it meant [that phrase], here we find it.").

5. The Settlement Acts' Grant of Sustenance Fishing Rights to the Nation Does Not Alter § 6203(8)'s Plain Meaning.

The Nation and the United States next argue that § 6207(4)'s grant of sustenance fishing rights to the Passamaquoddy Tribe and the Nation "within the boundaries of their . . . Indian reservations" means that § 6203(8)'s definition of Reservation must include the River and its submerged lands. They say that interpreting § 6203(8) to exclude the River's waters and submerged lands is inconsistent with § 6207(4)'s grant of sustenance fishing rights because the Nation can only exercise these rights in the River.[21]

---

[21] The Nation says that there are no waters on the surfaces of the islands to support fish. The State Defendants have admitted to this fact. MIA was amended in 1988 and 2009 to include lands other than the islands in the definition of "Penobscot Indian Reservation," but when the statute was originally passed in 1980, only the islands were included in that definition.

- 45 -

At this stage, our inquiry is focused on the meaning of Reservation under § 6203(8), not the scope of the Nation's sustenance fishing rights under § 6207(4). We consider whether the statutory scheme is coherent and consistent if Reservation is given its plain meaning and this meaning is applied consistently throughout the Settlement Acts, including to § 6207(4)'s grant of sustenance fishing rights. See Barnhart, 534 U.S. at 450. We hold that it is. Whether the phrase "Indian reservations" used in § 6207(4)'s grant of sustenance fishing rights is itself ambiguous and susceptible to an interpretation that includes the Main Stem is an entirely separate issue that we address later. The fact that the Settlement Acts are coherent and consistent when "Indian reservations" is taken to incorporate the plain meaning of Penobscot Indian Reservation and exclude the Main Stem reinforces our conclusion that the plain meaning of "islands" controls.

Section 6207(4) uses the phrase "Indian reservations" to refer to two tribes' reservations, the Passamaquoddy Indian Reservation and the Penobscot Indian Reservation. Even if the Nation cannot exercise its sustenance fishing rights on its islands, there is nothing in the record to indicate that the sustenance fishing rights guaranteed to the Passamaquoddy Tribe by § 6207(4) is meaningless.[22] The Nation and United States' argument

---

[22] The dissent argues that for the Passamaquoddy Tribe to have sustenance fishing rights, the definition "'Passamaquoddy

- 46 -

that § 6207(4) is incoherent as applied to the Nation alone ignores § 6207(4)'s broader application and context.  The section still has meaning as applied to the Passamaquoddy Tribe and is not, as the Nation and United States argue, rendered a nullity when "islands" is given its plain meaning.

The Nation, the United States, and the dissent read too much into the § 6207(4)'s grant of sustenance fishing rights.  Section § 6203(8) gives a clear definition of "Penobscot Indian Reservation" that does not include the Main Stem.  The Settlement Acts' context and purpose confirm this reading, and they are fully coherent when the Reservation is given this meaning.  We have not, as the dissent argues, "set aside" § 6207(4) in determining what § 6203(8) means.  We have explicitly considered whether § 6207(4) makes sense when § 6203(8) is understood to exclude the Main Stem, and we conclude that it does.  See Ali v. Fed. Bureau of Prisons,

Indian Reservation' means those lands as defined in [MIA]" in § 1722(f) of MICSA must mean that the Passamaquoddy Reservation includes lands and waters.  It says that this creates a "fatal flaw" in our argument that § 1722(i)'s similarly worded definition of Penobscot Indian Reservation means only lands.  We see no flaw, as the language used to describe the parcels included in the Passamaquoddy Indian Reservation is very different from the language used in the definition of Penobscot Indian Reservation. For example, the inclusion of "Indian Township in Washington County" in the definition of Passamaquoddy Indian Reservation, Me. Rev. Stat. Ann. tit. 30, § 6203(5), closely resembles the reservation of an "undivided tract of land described merely by exterior metes and bounds" that the Court has held includes "all of the land inside those boundaries including the river," Choctaw Nation, 397 U.S. at 628.

552 U.S. 214, 222 (2008) ("[O]ur construction . . . must, to the extent possible, ensure that the statutory scheme is coherent and consistent."). The dissent insists that the "Penobscot Indian Reservation" defined in § 6203(8) must have a meaning consistent with the "Indian reservation[]" used in § 6207(4), but, as we have explained, the dissent's interpretation would create an inconsistency within § 6203(8) itself. We cannot conclude, as the dissent would, that the Settlement Acts' drafters intended to override the text of § 6203(8) by implication when they used a different term in a different section of MIA that applies to more than one tribe. We presume that the drafters did not "hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001).

Despite our conclusion that § 6207(4) is still coherent when Reservation is given its plain meaning, we agree with the Nation and the United States that "Indian reservations" as used in § 6207(4) is itself ambiguous and that § 6207(4) grants the Nation sustenance fishing rights in the Main Stem.[23] We do not, as the dissent says, hold that § 6207(4) must be read in this way. And we do not agree that reading § 6207(4) this way means we must

---

[23] This is a separate issue from whether Maine has violated the Nation's rights under § 6207(4). As we explain later, we do not reach the Nation's sustenance fishing claim because the Nation lacks standing and the claim is not ripe.

deprive § 6203(8) of its plain meaning.  The two provisions can and do coexist.

Nothing in § 6207(4)'s use of the phrase "Indian reservations" alters the plain meaning of § 6203(8).  MIA itself tells us this.  Section 6203 says that the statute's definitions do not apply when "the context indicates otherwise."  Me. Rev. Stat. Ann. tit. 30, § 6203.  The Supreme Court has also held that "context counts" and that "[t]here is . . . no 'effectively irrebuttable' presumption that the same defined term in different provisions of the same statute must 'be interpreted identically.'" Env't. Def. v. Duke Energy Corp., 549 U.S. 561, 575-76 (2007) (quoting United States v. Duke Energy Corp., 411 F.3d 539, 550 (4th Cir. 2005)); see also Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 207 (2009) ("[T]he statutory definition . . . does not apply to every use of the term 'political subdivision' in the Act.").  The fact that § 6207(4) does not even use the defined term "Penobscot Indian Reservation" and nowhere indicates that "Indian reservations" incorporates § 6203(8)'s definition provides even more evidence that the Nation's sustenance fishing right is not necessarily limited to the Reservation.

Section 6207(4) has meaning and that meaning is consistent with our holding as to § 6203(8). Whether Congress was aware or not that there are no places to fish on the Reservation's

islands, § 6207(4) means that the Nation has the right to engage in sustenance fishing in the Main Stem.  That is a different right than the ownership rights the Nation is asserting under § 6203(8).

Nothing in the legislative history indicates that the drafters of the Settlement Acts intended to restrict the Nation's existing right to fish in the Main Stem.[24]  To the contrary, their aim was to strengthen it.  The House and Senate Reports explain that Maine previously recognized the Nation's "right to control Indian subsistence hunting and fishing within their reservations" and that § 6207(4) ends "[t]he power of [Maine] to alter" these rights.[25]  See Senate Report at 16; House Report at 17-18.  Legislative history from the passage of MIA also confirms that the drafters understood that the right to sustenance fish could be exercised in the Main Stem.  See Hearing on Legis. Doc. 2037 Before the Joint Select Comm. on Indian Land Claims, 109th Leg., 2d Reg. Sess. 55-56 (Me. 1980) (statement of Mr. Patterson that "the contemplation of this draft was to keep in place that same kind of right and provide that the Indians could continue to sustenance

---

[24]   The record is clear that some members of the Nation have relied on sustenance fishing for generations before the Settlement Acts were passed.

[25]   Before the Settlement Acts, Maine law said that the Commissioner of Inland Fisheries and Wildlife "shall issue a . . . fishing license to any [Penobscot] Indian."  1979 Me. Laws ch. 420 § 9(A).  It also recognized the "right of Indians to take fish and wildlife for their own sustenance on their reservation lands."  Id. § 9(B).

hunt and fish"); id. at 120 (raising concern that the sustenance fishing right would allow the Nation to cast a net "right across these rivers [including the Penobscot River] and completely wipe out . . . the spawning stock").

Given this context, we conclude that the drafters did not intend for the phrase "Indian reservations," as used in § 6207(4) and applied to the Nation, to have the same meaning as "Penobscot Indian Reservation." Under this interpretation, the Settlement Acts give the Nation sustenance fishing rights in the Main Stem even though the River and its submerged lands are not part of the Reservation. There is no serious dispute about whether the Settlement Acts give the Nation sustenance fishing rights in the Main Stem. They do. The dispute here is over ownership of the River and its submerged lands, and we have explained why we have reached the interpretation we have.

B. The Nation's Assertion that Maine Has Infringed Its Sustenance Fishing Rights Is Not Ripe and the Nation Lacks Standing to Pursue That Claim.

We view differently the claim that Maine has infringed those fishing rights and that infringement justifies the issuance of a declaratory judgment. See Me. Rev. Stat. Ann. tit. 30, § 6207(4). The district court erred in issuing a declaratory judgment because the Nation lacks standing to pursue this claim and the claim is not ripe. "The requirements for a justiciable case or controversy are no less strict in a declaratory judgment

- 51 -

proceeding than in any other type of suit." Ala. State Fed'n of Labor v. McAdory, 325 U.S. 450, 461 (1945). We vacate the district court's ruling on this issue and order dismissal of the claim without prejudice.

Article III of the Constitution limits federal courts' jurisdiction to cases or controversies. See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157, 182-83 (1st Cir. 2020) (citing Warth v. Seldin, 422 U.S. 490, 498 (1975)). "The doctrines of standing and ripeness 'originate' from the same Article III limitation." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 n.5 (2014).

1. The Nation Does Not Have Standing to Pursue Its Claim That Maine Has Violated the Sustenance Fishing Rights Guaranteed to it Under MIA.

To have standing, a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). The Nation has suffered no injury in fact.

An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Sometimes, the threat of enforcement alone "may suffice as an 'imminent' Article III injury in fact." Reddy v. Foster, 845 F.3d

493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List, 573 U.S. at 158). The Nation argues that it has suffered an injury in fact because the Schneider Opinion is a concrete and particularized imminent threat to its sustenance fishing rights.

We see no imminent threat. The Schneider Opinion does not even mention the Nation's sustenance fishing rights. It does not prevent any tribal member from engaging in sustenance fishing. Maine has not prevented any Nation member from engaging in sustenance fishing. Indeed, Maine has a "long-standing policy of not interfering with tribal members' sustenance fishing in the Main Stem" and has represented to us that it has "no intention of changing that policy." Under circumstances like these, when "a future injury is 'too speculative for Article III purposes' and no prosecution is even close to impending," a plaintiff lacks standing. See Reddy, 845 F.3d at 500 (quoting Blum v. Holder, 744 F.3d 790, 799 (1st Cir. 2014)).

There is no support in the record for the Nation's claims that the Schneider Opinion threatens its sovereignty or regulatory authority. The cases cited by the Nation for the proposition that tribes are granted special solicitude as sovereigns in the standing analysis are also inapposite. In those cases, there was actual harm to tribal members or people operating in tribal territory that threatened the tribes' sovereignty. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv., 425 U.S. 463, 468-69,

469 n.7 (1976) (tribe had standing to challenge Montana's statutory scheme for assessment and collection of personal property taxes from tribe's members); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 139-40 (1980) (tribe had standing to challenge Arizona's taxes on a logging company operating solely on an Indian reservation when the tribe agreed to reimburse the company for taxes it paid for its on-reservation activity).  The Nation has not shown that it faces an actual or imminent harm in this case.

    2. The Nation's Claim That Maine Has Violated the Sustenance Fishing Rights Guaranteed to it Under MIA Is Not Ripe.

The Nation's claim is also not ripe.  Our "[r]ipeness analysis has two prongs: 'fitness' and 'hardship.'"  See Reddy, 845 F.3d at 501 (citing Texas v. United States, 523 U.S. 296, 300-01 (1998)).  The fitness prong asks "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  Town of Barnstable v. O'Connor, 786 F.3d 130, 143 (1st Cir. 2015) (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)).  The hardship prong is prudential and asks what harm would come to those seeking relief if we withheld a decision.  Reddy, 845 F.3d at 501 (citing Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016)).

Neither prong is met here.  On the fitness prong, the Nation's claim depends on uncertain or contingent events.  There

is no evidence that Maine has interfered with the Nation's sustenance fishing rights or that it may do so in the future. Cf. McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 72 (1st Cir. 2003) ("[T]hat the future event may never come to pass augurs against a finding of fitness."). There is no concrete dispute before us.

The hardship prong is also not met. Our analysis "focuses on 'direct and immediate' harm." Id. at 73. "[T]here is no apparent prejudice to the plaintiffs if they must wait until their claims ripen to sue" here because "[t]hey are not 'required to engage in, or to refrain from, any conduct, unless and until'" Maine either interferes with the Nation's sustenance fishing rights or demonstrates an intent to do so. Reddy, 845 F.3d at 505 (quoting Texas, 523 U.S. at 301).

## III.

The judgment of the district court is affirmed as to the definition of "Penobscot Indian Reservation" under Me. Rev. Stat. Ann. tit. 30, § 6203(8) and 25 U.S.C. § 1722(i) and vacated with instructions to dismiss without prejudice for want of jurisdiction as to the declaratory judgment regarding the sustenance fishing rights under Me. Rev. Stat. Ann. tit. 30, § 6207(4). No costs are awarded.

**- Concurring and Dissenting Opinion Follows -**

- 55 -

BARRON, **Circuit Judge**, with whom THOMPSON, **Circuit Judge**, joins, concurring in part and dissenting in part. The State of Maine enacted the Maine Implementing Act ("MIA") in 1980 in tandem with Congress's passage that same year of the Maine Indian Claims Settlement Act ("MICSA"). Together, the measures sought to settle then-pending litigation that had called into question, among other things, the legal status of cessions of land "on both sides of the Penobscot [R]iver" that the Penobscot Nation had made first to Massachusetts, and then to Maine, in treaties around the turn of the nineteenth century. The questions that we must resolve in this appeal concern one aspect of the settlement that these Acts brought about -- the nature of the rights in certain waters of the Penobscot River that the Nation would continue to enjoy.

I agree with the majority that the Settlement Acts, in effectively blessing the Penobscot Nation's long-ago transfers of land beyond the banks of the river, did not leave the Nation with nothing in return as to the waters in between. In particular, I agree with the majority that those Acts secure to the Nation a limited right that entitles its members to fish in those waters for their own sustenance. But, I cannot agree with the majority's further and more consequential conclusion that the Acts give the Nation no further rights in those waters.

The majority arrives at this result by narrowly construing the provision in the Acts that purports to define the

"Penobscot Indian Reservation" so that it excludes altogether the waters of the Penobscot River. The consequence is that the sovereign rights to regulate the taking of wildlife that the Settlement Acts expressly entitle this riverine Nation to exercise throughout its "Reservation" extend to no portion of the Penobscot River itself.

Yet, as I will explain, the statutory text does not compel such a landlocked construction of the "Penobscot Indian Reservation." In fact, a different provision of the same statute that defines the "Reservation" expressly describes the "boundaries" of the "Penobscot Nation . . . Indian reservation[]" in terms that even the majority agrees include the portions of the Penobscot River that are in dispute. See Me. Rev. Stat. Ann. tit. 30, § 6207(4).

The problem with the majority's narrow construction, however, runs deeper still. The Settlement Acts were intended in significant part to make up for the fact that the Nation had entered into the treaties at the heart of the underlying disputes over land transfers without the federal authorization that Congress had early on required in the Trade and Intercourse Act of 1790 ("the Nonintercourse Act"), see 25 U.S.C. § 1721(a)(1), to protect tribes from states swindling them.[26] After all, it was the

_____

[26] In Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975), this Court confirmed that

- 57 -

lack of any such congressional authorization for those treaties that led the Nation to assert that the land transfers that it had made in them were without legal effect, thereby precipitating the title disputes that the Settlement Acts aimed to resolve. It is thus tragically ironic, in my view, that the majority now construes the Acts to leave the Nation with even fewer sovereign rights in the river that has been its lifeblood than it had reserved for itself in its own unprotected dealings with those two states so early on in our history.

Moreover, precisely because text, history, and purpose undermine the notion that the definition of the Nation's "Reservation" in the Settlement Acts clearly excludes the waters at issue, longstanding principles of interpretation require that we construe that definition to include those waters. For, those principles require that we resolve an ambiguity on that score in the Nation's favor, see County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 269 (1992), and, at the very least, we confront such an ambiguity here.

---

the Nonintercourse Act applied to the Passamaquoddy Tribe and created a trust relationship between the United States and that tribe. See id. at 373. The Penobscot Nation's land claims preceding the MICSA were premised on the theory -- which is not challenged here -- that the same would be true of the Penobscot Nation. See Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 388 F. Supp. 649, 654 n.6 (D. Me. 1975).

**I.**

The MICSA provides that the "'Penobscot Indian Reservation' means those lands as defined in the [MIA]." 25 U.S.C. § 1722(i). The MIA in turn provides that the

> "Penobscot Indian Reservation" means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act.

Me. Rev. Stat. Ann. tit. 30, § 6203(8).

The ultimate question that we must decide on appeal, in light of these two provisions, is a relatively discrete one of statutory interpretation. It concerns whether the definition of the "Penobscot Indian Reservation" in § 6203(8) of the MIA encompasses only the uplands of the individual islands to which it refers -- which is all the majority concludes that it includes -- or also the whole of the area comprising the uplands of those islands, waters included -- which is what the Penobscot Nation contends that it does.[27]

---

[27] In construing the Settlement Acts, we have held that because the MICSA adopted the MIA, interpretative questions about provisions of the MIA are federal questions. See Penobscot Nation v. Fellencer, 164 F.3d 706, 708 (1st Cir. 1999) (explaining that "[b]ecause the phrase 'internal tribal matters' was adopted by the federal Settlement Act, the meaning of that phrase [which does not

Before answering that question, however, it helps to clarify more precisely what is at stake in this interpretive dispute, as there appears to be some confusion on that point. Critical to sorting out that confusion is a recognition that § 6203(8) of the MIA, by its own terms, is definitional rather than substantive. It only purports to define, in other words, what the term "Penobscot Indian Reservation" in the Settlement Acts themselves -- when used elsewhere in them -- means. It does not itself purport to establish a reservation in the typical sense.

This fact is significant. In consequence of it, the meaning assigned to "Penobscot Indian Reservation" in § 6203(8) of the MIA must be understood in connection with the concrete rights and authorities that the Settlement Acts themselves provide that the Penobscot Nation enjoys within what those same Acts call the Nation's "Reservation." As a result, the lengthy arguments of the State of Maine and the Intervenors that "ownership" of the relevant stretch of the river, including its submerged lands, is at issue in this appeal are, in the end, a distraction. Whatever claims the Penobscot Nation might have in that regard, the Nation seeks here to prove with respect to the definition of the "Penobscot

appear in the MICSA itself] raises a question of federal law"). Accordingly, although § 6203(8) of the MIA is itself a provision of state law, the parties do not dispute that its meaning is a question of federal law such that we have jurisdiction under 28 U.S.C. § 1331.

Indian Reservation" in § 6203(8) of the MIA only that the definition is broad enough to ensure that, when it is plugged into the substantive provisions of the MIA that are keyed to it, the Nation will have the same right to regulate hunting and trapping in the waters in that stretch of the river that the Nation generally has under those same substantive provisions within the boundaries of the "Penobscot Indian Reservation."[28]

Having clarified that much up front, though, there is still one further threshold point to address. It concerns the interpretive resources that we may draw upon to decide how best to determine whether the definition of the term "Penobscot Indian Reservation" in § 6203(8) of the MIA refers to the relevant waters or only to the uplands located in them. I thus begin my analysis there, as a consideration of this question of interpretive method demonstrates, in my view, the errors in the majority's rationale for its lead holding, in which the majority gives this definition in § 6203(8) of the MIA a narrow, uplands-only construction.

**A.**

The majority explains that in construing the definition of the "Penobscot Indian Reservation" in § 6203(8) of the MIA we may not draw upon what history shows about the Penobscot Nation's

---

[28] For that reason, I do not consider the argument that adjudication of the ownership of the river would require joinder of riverfront landowners or that fee simple title in the river is owned in trust by the State.

past understandings regarding its rights in the waters at issue. The majority further explains that in construing that definitional provision we may not rely on any of the canons of construction relating to Indian tribes.

In the majority's view, we must labor under these interpretive constraints because this statutory provision's text -- given the ordinary meaning of the words in it -- in and of itself compels an uplands-only reading. The majority emphasizes that a statute's words should be given their ordinary meaning if the legislature does not define them. See Maj. Op. 11-12, 11 n.5. It then asserts that the ordinary meaning of the word "islands" in § 6203(8) of the MIA -- and "lands" in the provision of the MICSA that cross-references that provision of the MIA -- conveys an uplands-only, not a waters-inclusive, understanding. Maj. Op. 12-13. Thus, the majority concludes, because neither the word "islands" nor the word "lands" is defined in either the MIA or the MICSA, the ordinary, water-less meaning of "islands" and "lands" controls.

The majority finds additional support for this dictionary-based reading of the relevant statutory text in the fact that the Settlement Acts do not use a single geographic name for the islands referred to in § 6203(8). Nor, the majority points out, do those Acts describe the islands at any point with reference to any words that require the islands to be treated as a collective

-- and thus as an area including the surrounding waters -- rather than as individual land masses. See Maj. Op. 17.

The majority does address the contention that the qualifier "reserved to the Penobscot Nation by agreement" in § 6203(8) of the MIA suggests that we should set the dictionary aside and consult history to discern whether what had been "reserved . . . by agreement" encompasses any of the waters that surround the islands' uplands. Maj. Op. 21-22. The majority concludes, however, that the text of § 6203(8) makes perfectly clear that the "islands" to which that definitional provision is referring are only those that the "consisting" phrase within that same provision describes them to be. See Maj. Op. 22-23.

The majority explains in this regard that the word "islands" is used in that phrase in conjunction with the words "solely" and "in the Penobscot River," and it concludes that those two modifiers themselves support a dictionary-based (and thus, in the majority's view, uplands-only) understanding of "islands." See Maj. Op. 13-14, 17. In fact, the majority asserts, the word "islands" in § 6203(8) of the MIA would have to bear two distinct meanings in the same provision -- one including waters and one not -- for the area-based construction of § 6203(8) of that statute for which the Nation advocates to be a viable one. See Maj. Op. 25-26.

**B.**

The majority is right that we have no warrant to rely on extra-textual interpretive aids to construe the definition in § 6203(8) of the MIA if that text is as clear as the majority concludes that it is. But, even when a statute uses words that on their own bear an ordinary meaning that is plain, there may still be ambiguity as to whether it is plain that those words should be given that ordinary meaning. See Yates v. United States, 574 U.S. 528, 537 (2015) ("Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words. Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" (alterations in original) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997))); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012) ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise . . . . which ordinarily comes from context."); id. at 73 ("Sometimes context indicates that a technical meaning applies.").

Thus, even if the majority is right that the words "lands" and "islands" in isolation bear an ordinary meaning that plainly excludes waters offshore, we still must assess whether

those words carry their ordinary meanings here, given the specific way in which those words are used in the statutory provisions at hand. In my view, there is good reason to conclude from the text of § 6203(8) of the MIA alone that those words do not.

**1.**

For starters, the word "islands" appears in § 6203(8) of the MIA only as a constituent part of a larger phrase. See Bostock v. Clayton County, 140 S. Ct. 1731, 1750 (2020). That larger phrase, moreover, refers to a specific group of islands both for the purpose of defining where as part of a settlement of rights to land and natural resources the Nation may exercise certain sovereign rights and in terms of what had been "reserved to the Penobscot Nation by agreement," Me. Rev. Stat. Ann. tit. 30, § 6203(8).

The plain text of § 6203(8) of the MIA in these ways supplies a reason why the word "islands" as it appears in this context might not mean what it ordinarily would if it were considered on its own. That being so, the same is necessarily also true of the word "lands." That word, after all, appears in the provision of the MICSA that directs the reader to § 6203(8) of the MIA to find the definition of the "Penobscot Indian Reservation."[29]

_____

[29] No party has argued on appeal that we should understand the fact that this provision of the MICSA refers to "those lands

- 65 -

Precedent from the Supreme Court of the United States supports the conclusion that the features of the text of § 6203(8) of the MIA that I have just described render that provision more ambiguous in the relevant respect than the majority allows. On more than one occasion, the Court has held that reservation-defining statutes refer to waters despite their failure to make any express reference to those waters and despite their use of geographic terms that, in and of themselves, ordinarily might be understood to refer to dry land only.

For example, in Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918), the Court considered a statute that defined a reservation as consisting of "the body of lands known as Annette Islands" and held that, textually speaking, that larger phrase arguably could refer to "the area comprising the islands" -- and thus an area inclusive of waters -- rather than only to the uplands in that area. Id. at 86-89. For that reason, the Court determined, only an inquiry into sources beyond those that would merely disclose the ordinary meaning of the words "lands" or "islands" could reveal the intended meaning of the larger phrase in which those words were embedded. See id. at 87.[30]

_____

as defined in the [MIA]," 25 U.S.C. § 1722(i) (emphasis added), to limit the definition in § 6203(8) of the MIA.

[30] The majority notes, Maj. Op. 16, that Alaska Pacific Fisheries concerns Alaska and that, as the Supreme Court just observed, "[t]he 'simple truth' . . . is that 'Alaska is often the exception, not the rule.'" Yellen v. Confederated Tribes of the

Similarly, in Hynes v. Grimes Packing Co., 337 U.S. 86 (1949), the Court held that the statutory phrase "any other public lands which are actually occupied by Indians or Eskimos within said Territory" did not, in consequence of the ordinary meaning of the word "lands" alone, resolve whether the reservation that it purported to define included coastal waters. See id. at 91-92, 110-11. Thus, the Court there, too, concluded that only a broader consideration of legislative purpose, as informed by the history of how the native peoples interacted with those waters, could resolve whether the phrase invoking the word "lands" did or did not include those waters. Id. at 115-16.[31]

The Court later explained in Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987), that an extra-textual, historically informed inquiry was proper in each of those earlier cases precisely because the reservation-defining statute had in

Chehalis Rsrv., ___ S. Ct. ___, 2021 WL 2599432, at *3 (2021) [No. 20-543] (quoting Sturgeon v. Frost, 577 U.S. 424, 440 (2016)). But, there is no suggestion in Alaska Pacific Fisheries, Confederated Tribes of the Chehalis Reservation (which does not reference Alaska Pacific Fisheries), or any case in between that would provide a basis for concluding that the Court would find the relevant text in the statute set forth in Alaska Pacific Fisheries to exclude the waters surrounding the Annette Islands if that collection of islands happened to have been located somewhere other than Alaska.

[31] True, Hynes is also a case from Alaska, but not even the majority suggests that its state of origin was what made the relevant phrase there not susceptible of being construed with only a dictionary as an aid.

each instance used a phrase that, despite the common geographic terms embedded therein, had no "precise geographic/political meaning[] which would have been commonly understood, without further inquiry, to exclude the waters."  Id. at 547 n.14. Accordingly, the Court determined that, given the larger phrase used, fidelity to text had required in each case the conclusion that "[t]he meaning of the phrase[] had to be derived from [its] context in the statute[]."  Id.

Against that precedential backdrop, the fact that we confront here not just the word "islands" -- or "lands" -- but a larger phrase referring to a specific set of "islands" should give us some reason to pause before we turn to the dictionary's definition of those discrete words to discern the meaning of that larger phrase.  As in Alaska Pacific Fisheries and Hynes, the phrase that matters here is configured in a way that at least raises the question whether it refers to an area inclusive of waters, despite the fact that the only geographic terms used in connection with that phrase are "islands" and "lands."  That is not because we have no choice but to conclude that the word "islands" is itself being used -- unusually -- as a "term of art." See Maj. Op. 21-22.  It is because we are construing a larger phrase, of which "islands" is just a key part, and not that word on its own.

Consider that, like the reference to "Annette Islands" in Alaska Pacific Fisheries, the reference to "islands" in the relevant phrase here concerns a discrete and definable grouping, rather than a disparate assortment, of land masses that is located in one continuous and discernable stretch of waters. For this reason, geographic reality no more rules out an area-based reading of the relevant phrase than it did in Alaska Pacific Fisheries.

Consider also that, like the statute in Alaska Pacific Fisheries, this one refers to the "islands" as an undifferentiated group -- "all islands" -- without purporting to distinguish which among them are "the site of [the tribe's] village[s], or the island[s] on which they were dwelling," Alaska Pac. Fisheries, 248 U.S. at 89. For this reason as well, the text is arguably suggestive of an area comprising the islands, waters included.[32]

There is, however, yet one more reason to be wary of reaching too quickly for the dictionary -- and thus looking at no

_____

[32] The United States argues that "islands" could be broader than the discrete uplands because, under Massachusetts and Maine common law, island estates ordinarily included submerged lands and associated rights to riverine resources -- thus, with respect to any individual island, there may be an ambiguity at least as to whether it would include submerged lands to the thread of the river. The State challenges this understanding of the relevant common law. In light of Alaska Pacific Fisheries, and for the reasons set forth below, I find that "islands in the Penobscot River reserved to the Penobscot Nation by agreement" is sufficiently susceptible of an area-based understanding that it is not necessary to reach this dispute about what each individual island may include in terms of attendant waters under state common law.

other extra-textual source -- to determine the meaning of § 6203(8) of the MIA with respect to the uplands/waters issue. As I have mentioned, the larger phrase that we are concerned with in that provision specifies that it is referring to what was "reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine." That same phrase then goes on to reference a specific date in 1818 in defining what was "reserved," and that date, of course, is the one on which the Penobscot Nation signed the "treaty" with Massachusetts in which the Nation purported to cede the lands "on both sides of the . . . river" while keeping "all the islands" in the relevant stretch of the river. Treaty Made by the Commonwealth of Massachusetts with the Penobscot Tribe of Indians, June 29, 1818, in Acts and Resolves Passed by the Twenty-Third Legislature of the State of Maine, A.D., 1843, at 253, 253-54 (Augusta, Wm. R. Smith & Co. 1843) [hereinafter 1818 Treaty].

Quite obviously, no dictionary can reveal the nature of an earlier agreed-to reservation between specific historically rooted sovereign actors, see Amoco Prod. Co., 480 U.S. at 547 n.14, just as no dictionary could have given content to the use-based qualifier that the relevant statute in Hynes included. Given that the "Reservation" here concerns a group of islands in a stretch of water that marks out a cohesive area in its own right, there is no reason rooted in fidelity to text that would require us to construe the phrase as if the terms of, and understandings about, that prior

agreement are wholly beside the point insofar as those terms and understandings would support an area-based rather than uplands-only construction. Rather, the text would seem rather strongly to suggest that the drafters intended to give effect to these very understandings in § 6203(8) even if they would support such an area-based construction. Indeed, even Maine adamantly took the position in earlier litigation that a proper determination of the "Reservation" necessarily "<u>involves analysis of the relevant treaties</u> referenced in the Reservation definitions in the [MIA] <u>including the historical transfers</u> of Reservation lands and natural resources." Brief of Petitioner State of Maine at 58, <u>Maine</u> v. <u>Johnson</u>, 498 F.3d 37 (1st Cir. 2007) (Nos. 04-1363, 04-1375) (emphases added).

## 2.

For all these reasons, the majority's uplands-only construction of § 6203(8) -- rooted as it is in a claim about the limited, dictionary-based interpretive method that we must use -- is less clearly one that the text in and of itself compels than the majority contends. That is especially so when one recognizes that the majority's construction is hard to square with standard interpretive practices, because it appears to attribute no independent meaning to the phrase "reserved . . . by agreement."

As we have seen, the majority appears to treat the "reserved . . . by agreement" qualifier as if it were superfluous.

In fact, because that qualifier precedes the "consisting" phrase, § 6203(8) changes not a bit in the majority's view if the qualifier is omitted.[33]

We are generally loath, however, to treat statutory words as wasted. Nor would there appear to be any special reason to conclude that the words to which the majority assigns no import here are ones that need not have been included at all.

Those words appear alongside the provision's express reference to the 1818 date. That is the date of an agreement excluding "all islands" in the river from the cessions of lands "on both sides of" it that the Nation had purported to make. The joint inclusion of the reference to islands that had been "reserved . . . by agreement" and the date of a past agreement

---

[33] The majority asserts that the qualifier is necessary to clarify that islands transferred by the Nation prior to 1818 are not part of the Penobscot Indian Reservation. Maj. Op. 23-24, 23 n.11. The majority does not assert, however, that any island was transferred by the Nation before 1818, and the 1818 treaty's "covenant . . . that [the Nation] shall have, enjoy and improve . . . all the islands in the Penobscot river above Oldtown and including said Oldtown island," 1818 Treaty, supra, at 254, suggests that there had been no such transfer, at least in the relevant stretch of the river. If any island not in that stretch of the river had been transferred before that date, § 6203(8) would already exclude that island by virtue of the "consisting solely" phrase. The "reserved . . . by agreement" language thus would not in that event be necessary to make that exclusion clear. Aside from the counterfactual nature of the majority's explanation of the function of "reserved . . . by agreement," it would be strange in light of the drafters' explicit exclusion of post-1818 transfers to conclude that the drafters effected the exclusion of pre-1818 transfers in such an oblique way.

making a reservation involving those very islands surely provides some reason to think that the ordinary meaning of "islands" might not be an entirely reliable guide to § 6203(8)'s meaning insofar as the agreement that had been struck by the Nation on that date reflected a different understanding of what the Nation had reserved than the dictionary definition of "island" would supply. And, as I have noted, Maine itself once read the text in just this historically informed manner, taking the position that the definition of the "Penobscot Indian Reservation" in § 6203(8) of the MIA had to be construed in light of the understandings of the parties to the 1818 treaty and not without considering them at all.

Perhaps, then, the initial phrase in § 6203(8) of the MIA, which contains this backward-looking qualifier about what had been agreed to in the past, is best construed to have been intended to give effect to the outcome of an agreement as the parties to it understood it when it was struck centuries before. True, the definition does not just end with the reference to what had been "reserved . . . by agreement." It goes on to include the trailing "consisting" and "excepting" phrases. But, the inclusion of those phrases hardly compels a reading that would make the reference to the prior agreement of no import. Instead, those phrases may comfortably be read to be usefully clarifying -- just as settlements of disputes over the meaning of old agreements often

do -- critical details concerning what the parties to the settlement that the Settlement Acts effected understood to have been reserved in the earlier treaty.

Indeed, a comparison of the 1818 treaty and § 6203(8) of the MIA reveals that the drafters of the MIA merely revised the more encompassing "including" phrase of that treaty by substituting for it the more limiting "consisting solely" and "excepting" phrases. By doing so, they accounted for post-treaty developments (whether man-made or naturally occurring) that obviously could not have been known in 1818. They thus ensured through that revision of the treaty's language that § 6203(8) of the MIA would account for matters that -- given their late-breaking nature -- cannot have been understood to have been carefully considered by the treaty parties at that earlier time.

Of course, even on this reading of § 6203(8), the question would remain as to whether the larger phrase containing "the islands" in § 6203(8) of the MIA is referring to merely the uplands in the area demarcated by those "islands" or to the area comprising them and thus the waters in that area, too. The text of this provision -- at least in and of itself -- cannot be said to resolve that question conclusively in the Nation's favor, even if it <u>might</u> be so read. It all would depend, even on such a historically informed reading, on what the parties to the 1818

treaty understood to have been "reserved . . . by agreement" way back when.

But, I do note that an area-based reading does give a meaningful role to the "reserved . . . by agreement" language that the majority's uplands-only reading does not. It reads that language to have been included because the drafters were intent on capturing past understandings arising from past dealings. For this reason, too, the "reserved . . . by agreement" language should warn the reader away from an ahistorical, dictionary-based understanding of what is meant by "islands."

I recognize that the majority contends that the "consisting" phrase's own text in and of itself rules out an area-based reading, no matter what the history of past dealings might show. The majority explains that this is so in part because the word "solely" in that phrase compels the conclusion that the drafters of § 6203(8) of the MIA intended to debar the islands' surrounding waters from being within the "Reservation." See Maj. Op. 14.

But, I cannot agree with that analysis. The word "solely," given its placement, is, as a matter of grammar, merely narrowing the general set of "islands" that precedes it to a smaller set of "islands" that are thereafter described. It thus cannot be specifying an uplands-only rather than area-based understanding of "islands" any more than the use of the word

"solely" in the phrase "ship the bikes that had been ordered, consisting solely of the bikes in storage" could be read to be sorting between bikes that have baskets and those that do not. And that is especially so because the group of islands described after "solely," like the group of islands described before that term, is a group that, by virtue of how the islands are situated relative to one another, may easily be understood to demarcate an area comprising the islands.

Nor can I agree with the majority's related contention that the phrase "in the Penobscot River" requires an uplands-only reading. Maj. Op. 13-14. The reference to the islands "in the [river]" running from a southward point A to a northward point B is easily read to be merely part and parcel of the effort, partly carried out by the "consisting" phrase, to demarcate the bounds of the area as a whole, rather than to distinguish between the land masses and the surrounding waters within that area.

That leaves, then, only the majority's assertion that an area-based reading impermissibly requires that we give the word "islands" two distinct meanings in the same provision -- one referencing an area that includes waters and another referencing uplands alone. Maj. Op. 25-26. But, I do not see how such a reading does so.

The two phrases in § 6203(8) of the MIA that use that same word "islands" comfortably may be understood to be working

together to specify the area comprising the "islands." The "islands" referenced each time are ones that are grouped together in a continuous stretch of water and that are expressly referred to only in connection with the 1818 "agreement" that "reserved" them to the Nation. The latter phrase does, on such a reading, demarcate the area in a way that the former on its own does not. But, that does not mean the latter is not referring to an area just as the former is.

In fact, the "excepting" phrase that then follows accords with this same understanding -- even though, of course, it does not compel it. Unlike the phrases that contain the two prior references to "islands," the "excepting" phrase refers to "any island" that has certain specified attributes and so does not refer to the group of "islands" previously referenced at all. The singular-form reference to "any island" in the "excepting" phrase thus may be read to suggest that any discrete land mass with the attributes denominated -- that is, any individual land mass in that area that had been "transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act," Me. Rev. Stat. Ann. tit. 30, § 6203(8) -- is being excepted from the area comprising the "islands" already mentioned.

In this respect, the text admits of being read much as an admittedly stilted advertisement for "a tour of the U.S. Virgin

Islands, consisting solely of all those islands excepting the island of Saint Croix" might be. Such an advertisement is easily read to suggest that the tour will be of the entirety of the waters-inclusive area comprising the U.S. Virgin Islands, though not of the one particular upland portion of it that has been expressly excluded.

Finally, I realize that, as the majority notes, § 6203(8) of the MIA was amended in 1988 to add to the definition of "Penobscot Indian Reservation" certain parcels of land "acquired by the Penobscot Nation from Bangor Pacific Hydro Associates as compensation for flowage of reservation lands by the West Enfield dam." 1988 Me. Laws 1300. I also realize that the majority stresses that the compensation is only for flowage and not for the construction of a dam on the submerged lands of the Main Stem, which is the part of the Penobscot River that contains the waters in dispute.[34] Maj. Op. 30. The District Court relied on this amendment too, for the distinct point that it supports reading § 6203(8) of the MIA to include only the uplands given that, if the "Reservation" included the relevant waters of the Main Stem, flowage would not result in the loss of reservation space. See Penobscot Nation v. Mills, 151 F. Supp. 3d 181, 217 n.42 (D. Me. 2015).

---

[34] The dam was built in 1894 in the Penobscot River above Old Town.

But, the Penobscot Nation, like anyone, has different uses for uplands and waters, and the loss of an upland area is still a loss even if the flowage remains part of the "Reservation." The amendment makes sense, therefore, even if § 6203(8) of the MIA is read to mean the relevant area as a whole -- especially given the limited nature of the rights to regulate hunting and trapping in the waters in the area at issue that the Penobscot Nation contends that it would enjoy, at a minimum, if the "Reservation" does not exclude those waters altogether.

### 3.

For all these reasons, then, the text of § 6203(8) of the MIA itself may be read to be making a less-than-generic reference to the "islands" no less than the text in the reservation-defining statute in Alaska Pacific Fisheries. That said, there are textual differences between § 6203(8) of the MIA and the provision at issue in Alaska Pacific Fisheries, just as there are textual differences between § 6203(8) of the MIA and the provision at issue in Hynes.

I do not disagree that those differences supply some reason to hesitate before relying on those cases to find the kind of ambiguity here that would permit us to do what the Court did in each of those earlier cases:  look beyond a dictionary to history and context to determine what was intended.  But, as I will next explain, in light of the potential ambiguity in § 6203(8) of the

MIA, we cannot look to that provision alone to determine whether its text is ambiguous. We must at least consider that provision's text in the context of the text of the other provisions of the Settlement Acts. See Maj. Op. 43-45. And, when I consider one such provision, § 6207(4) of the MIA, any hesitancy that I might have about finding § 6203(8) to be ambiguous in the relevant respect dissipates. For, once that provision is brought into view, the textual case for reading § 6203(8) to be referring to the area comprising the islands "reserved . . . by agreement" rather than only to the uplands of the islands in that area is at the very least strong enough to render the provision unclear as to whether that area-based, waters-inclusive understanding is to be preferred.

### C.

Section 6207 of the MIA addresses the control over wildlife resources that the Penobscot Nation retains in Indian territory, including as to the part of such territory that is itself within the "Penobscot Indian Reservation."[35] As a discrete provision within that larger section, § 6207(4) addresses just one aspect of that control. It states that "the members of the

---

[35] In the Settlement Acts, Penobscot "territory" is not coextensive with the "Reservation." The latter refers to only the area set forth in § 6203(8). The former covers both the "Reservation" area and a number of other areas throughout Maine. Me. Rev. Stat. Ann. tit. 30, §§ 6203(9), 6205(2).

- 80 -

Passamaquoddy Tribe and the Penobscot Nation may take fish, within the boundaries of their respective Indian reservations, for their individual sustenance."  Me. Rev. Stat. Ann. tit. 30, § 6207(4).[36]

The reason that § 6207(4) of the MIA is so significant for present purposes is that the "Penobscot Nation . . . Indian reservation[]" to which this provision refers must be understood -- at least when read in context -- to include the area comprising the islands at issue in this case, waters included, rather than merely the discrete uplands that are situated in that area.  See Maj. Op. 48-51.

This conclusion follows from the District Court's factual finding, accepted by all parties to this appeal, that "[n]one of [the uplands of] those islands contains a body of water in which fish live."  Penobscot Nation, 151 F. Supp. 3d at 186.  In light of that finding, an interpretation of § 6207(4) of the MIA that permits fishing only from the uplands is an untenable one.  Given the "long-accepted practice of Penobscot Nation members sustenance fishing [from boats] in the Main Stem," id. at 220, and how ill-suited the uplands are to that practice, this sustenance fishing provision would have no practical meaning as to the

---

[36]    With the passage of the MIA, Maine repealed a state law that had established "the right of Indians to take fish and wildlife for their own sustenance on their own reservation lands." Me. Rev. Stat. Ann. tit. 12, § 7076(9)(B) (emphasis added), repealed by 1979 Me. Laws 2409.

Penobscot Nation if the "reservation[]" to which it refers encompassed only those uplands.

But, precisely because § 6207(4) of the MIA must be so understood despite the ambiguities that its text alone might contain -- as even the majority agrees, Maj. Op. 48[37] -- I do not

---

[37]     The majority does point out that § 6207(4) refers to the "reservations" of the Penobscot Nation and the Passamaquoddy Tribe.  Maj. Op. 46-47.  But, the plain text of that provision specifically provides that members of the Penobscot Nation and the Passamaquoddy Tribe "may take fish[] within the boundaries of their respective Indian reservations."  Me. Rev. Stat. Ann. tit. 30, § 6207(4) (emphasis added).  This language is much more specific than the similar state law provision that was repealed with the enactment of the MIA.  See Me. Rev. Stat. Ann. tit. 12, § 7076(9)(B) (establishing "the right of Indians to take fish and wildlife for their own sustenance on their own reservation lands" (emphasis added)).  Moreover, the legislative history makes clear that sustenance fishing in the Penobscot River, not merely within the Passamaquoddy Indian Reservation, was an issue of concern.  See, e.g., Penobscot Nation, 151 F. Supp. 3d at 191 (citing discussions of salmon fishing in the Penobscot River).

In addition to these reasons to think that § 6207(4) cannot be understood to have meaning only as to the Passamaquoddy Tribe, there is another.  The majority's conclusion that the Settlement Acts are "coherent and consistent" if "Reservation" in § 6203(8) excludes waters and that term is given a consistent meaning throughout the Settlement Acts depends on § 6207(4) having meaning as applied to the Passamaquoddy Tribe.  See Maj. Op. 46-47.  But, it has such meaning only if there are areas within the Passamaquoddy Indian Reservation where members of the Passamaquoddy Tribe can engage in sustenance fishing.  Assuming as the majority must for this argument about § 6207(4) that such areas do exist, there then becomes a fatal flaw in the majority's argument that "lands" in § 1722(i) of the MICSA excludes water.  See Maj. Op. 13, 18 n.8, 44.  That is because "lands" in § 1722(f), the identically worded MICSA provision that incorporates the MIA's definition of "Passamaquoddy Indian Reservation," would then have to refer to an area including waters.  Yet, if "lands," standing alone, is waters-inclusive in § 1722(f), how can that same word, in an identical phrase, "reinforc[e]," Maj. Op. 13, a waters-

- 82 -

see how the text of the MIA alone makes clear that § 6203(8) of that same statute is referring only to the uplands and not to the area comprising the islands. To so conclude, one would have to think it clear that the drafters of the MIA did not intend in referring to the "Penobscot Nation . . . Indian reservation[]" in § 6207(4) to have in mind the "Penobscot Indian Reservation" that § 6203(8) defines. But, how could we be certain of that? See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (explaining that we presume that "identical words used in different parts of the same act are intended to have the same meaning" (quoting Sorenson v. Sec'y of the Treasury, 475 U.S. 851, 860 (1986))).

The majority is right, see Maj. Op. 49, that § 6203 of the MIA expressly states that the definitions that follow in the various subsections of that provision apply "unless the context indicates otherwise," Me. Rev. Stat. Ann. tit. 30, § 6203. But, that provision obviously does not command that every term defined in § 6203 of the MIA must be given a variant meaning at some point.

Nor does the majority explain what "reservations" in § 6207(4) of the MIA would mean if it does not refer to the definitions of "Passamaquoddy Indian Reservation" and "Penobscot Indian Reservation" in § 6203(5) and § 6203(8), respectively. The absence of any such explanation is especially conspicuous given

excluding reading of the Settlement Acts' definition of "Penobscot Indian Reservation"?

- 83 -

that other provisions of the MIA in fact support reading "Indian reservation[]" in § 6207(4) to have the same meaning as "Penobscot Indian Reservation" in § 6203(8).[38]

The principle that elephants do not hide in mouseholes also would appear to counsel against the conclusion that the drafters of the MIA chose silently to refer to the Penobscot Indian Reservation in two fundamentally inconsistent ways. The term "Penobscot Indian Reservation" is of special importance to the statutory scheme, and, as we will see, sustenance fishing rights were central to the settlement discussions that led to the passage of the Settlement Acts. It would not have gone unnoticed that the

---

[38] In § 6209-B of the MIA, which explains the jurisdiction of the Penobscot Nation Tribal Court, the statute refers to "[c]riminal offenses . . . committed on the Indian reservation of the Penobscot Nation" and to application of laws "within the Penobscot Indian reservation" (both without capitalizing "reservation"). Me. Rev. Stat. Ann. tit. 30, § 6209-B(1). By all indications, § 6209-B(1) uses "Indian reservation of the Penobscot Nation" and "Penobscot Indian reservation" interchangeably, and there is no indication that these uses of "reservation" were not meant to incorporate the definition at § 6203(8). Thus, § 6209-B(1) suggests -- especially in light of the fact that there are very few verbatim uses of the precise defined term "Penobscot Indian Reservation," which appears outside of § 6203(8) only in § 6205 -- that references to "reservations" in the MIA are meant to incorporate the definitions of "Penobscot Indian Reservation" and "Passamaquoddy Indian Reservation" even if they do not use those exact terms. Moreover, other provisions of § 6207 of the MIA suggest that the drafters of the Settlement Acts were not using "reservation" as a catch-all term, as many of its provisions refer to the "respective Indian territories" of the Penobscot Nation and Passamaquoddy Tribe, see, e.g., Me. Rev. Stat. Ann. tit. 30, § 6207(1) (emphasis added) -- a reference that, by all indications, also refers to the definitions in § 6203, albeit to those for "Passamaquoddy Indian territory" and "Penobscot Indian territory."

- 84 -

same word was being used to convey such different meanings, and so the absence of any attempt to explain the decision to use the word in that nonuniform way would be surprising. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001); see also Gustafson v. Alloyd Co., 513 U.S. 561, 573 (1995) (explaining that "[t]he burden should be on the proponents of the view that" a term carries different meanings "to adduce strong textual support for that conclusion").[39]

There is yet one more reason, though, to question the majority's insistence that "reservation[]" in § 6207(4) of the MIA cannot be referring to the "Reservation" that § 6203(8) of this same statute defines. As I have emphasized, the definitional provision at § 6203(8) of the MIA explains what the term "'Penobscot Indian Reservation' means" when used in the MIA. Me. Rev. Stat. Ann. tit. 30, § 6203(8) (emphasis added). In this way, the definition contained in that provision of the MIA serves to give content to the rights in the Nation's "Indian Reservation" that the statute elsewhere confers. Because the definition

---

[39] I note that, by holding in the course of construing § 6203(8) of the MIA that the Nation has sustenance fishing rights under § 6207(4) of the MIA in the disputed portions of the Penobscot River, the majority necessarily renders moot the Nation's stand-alone request for a declaratory judgment to that exact same effect. Accordingly, I do not join the majority's separate holding that we lack Article III jurisdiction on ripeness and standing grounds to entertain the Nation's request for such declaratory relief, as, in my view, there is no reason for us to reach that constitutional issue here. See Maj. Op. 51-55.

performs this function in the MIA, however, it is hardly evident that "Penobscot Nation . . . Indian reservation[]" must be understood to mean something different and undefined in the provision of the MIA that lays out the Nation's rights with respect to sustenance fishing -- § 6207(4) -- from what the Nation's "Indian Reservation" in § 6203(8) of that statute means when that term appears in other provisions of the MIA that similarly specify the Nation's rights. To the contrary, it seems far more natural to read § 6207(4) to incorporate the definition of the "Indian Reservation" set forth in § 6203(8), precisely because that definition has a purpose only once it is plugged into such rights-granting provisions.[40]

To be clear, I am not arguing that § 6207(4) of the MIA "alters" the meaning of § 6203(8) of that statute. See Maj. Op. 49. I am arguing that § 6207(4) constitutes part of the statutory context that helps us decide the meaning of § 6203(8).

I can see no other way to proceed. It cannot be that we must set aside a provision purporting to refer to the "boundaries of the[]" "Penobscot Nation . . . Indian reservation[]" in

---

[40] For this same reason, the grant of sustenance fishing rights in § 6207(4) is in no way rendered unnecessary if the "Penobscot Indian Reservation" does include some waters of the Penobscot River. Under the MIA, the Nation's rights do not come from the definition of "Penobscot Indian Reservation." They come from provisions like § 6207(4). Otherwise, under the MIA, Maine maintains a large measure of regulatory authority even over areas within the "Reservation."

determining what another provision in the same statute, which expressly purports to define the boundaries of the "Penobscot Indian Reservation," means.

That being so, a consideration of these two provisions of the MIA together would suggest, if anything, that the drafters of the Settlement Acts understood the "Penobscot Indian Reservation" to be inclusive of the area comprising the islands named and not to consist only of the discrete -- water-less -- uplands in that area. Only that reading harmonizes the provisions. But, even if we cannot be certain that reading is intended, the two provisions together at the very least undermine the notion that § 6203(8) of the MIA clearly adopts an uplands-only understanding of "Reservation," given that § 6207(4) of that very statute (as even the majority agrees) rejects such a waters-excluding reading of that very same word.

### D.

The majority does make the fair point that if we are to look outside of § 6203(8) of the MIA to other provisions of the Settlement Acts for guidance about that definitional provision's intended meaning, then we cannot confine that review only to § 6207(4) of the MIA. But, that wider review does not itself suggest that § 6203(8) clearly defines the "Reservation" to include only the uplands of the islands "reserved . . . by agreement."

The majority emphasizes, Maj. Op. 44, that the MIA expressly defines "land or other natural resources" to include water and at other points references water rights or submerged land. Me. Rev. Stat. Ann. tit. 30, §§ 6203(3), 6207; see also 25 U.S.C. §§ 1721(b)(2), 1722(b). It thus considers the absence of those terms in § 6203(8) of that statute conspicuous. But, the possible ambiguity in § 6203(8) that is our concern arises from the use of the word "islands" in the course of a larger phrase that refers back to what was "reserved . . . by agreement." Thus, the bare reference elsewhere in the Settlement Acts to "lands" and "waters" fails to demonstrate that there is no such ambiguity to resolve.

The majority also points to § 6205(3)(A) of the MIA, which states that "[f]or purposes of this section, land along and adjacent to the Penobscot River shall be deemed to be contiguous to the Penobscot Indian Reservation." Maj. Op. 43. On a waters-inclusive understanding of § 6203(8), however, that language in § 6205(3)(A) would still be doing useful work. It would be clarifying what it means to be "contiguous" to a river. So, too, could it be making clear that lands that abut parts of the Penobscot River that are not part of the "Reservation" are considered contiguous to the "Reservation."[41]

_____

[41] The Intervenors argue that understanding "land along and adjacent to the Penobscot River" to include lands far away from

Finally, the majority invokes § 1723 of the MICSA, <u>see</u> Maj. Op. 32, which retroactively ratifies all "transfer[s] of land or natural resources located anywhere within the United States from, by, or on behalf of the . . . Penobscot Nation . . . or any of [its] members" and extinguishes aboriginal title to those lands or resources as of the date of any such transfer. 25 U.S.C. § 1723(a)-(b). That provision's import, however, is limited. It does not purport to extinguish aboriginal title to land not transferred.

The MICSA does broadly define "transfer" to include

> any voluntary or involuntary sale, grant, lease, allotment, partition, or other conveyance; any transaction the purpose of which was to effect a sale, grant, lease, allotment, partition, or conveyance; and any act, event, or circumstance that resulted in a change in title to, possession of, dominion over, or control of land or natural resources.

---

the "Reservation" along other stretches of the Penobscot River is in tension with the language in § 6205(3)(A) providing that such replacement lands are to be "as nearly adjacent to the parcel taken as practicable." But, because the reference in § 6205(3)(A) to "land along and adjacent to the Penobscot River" does not itself demarcate any particular stretch of the river, it can be understood as reflecting the understanding that it may not be practicable to acquire land that is on the bank of the stretch of the river within the "Reservation." Moreover, "along and adjacent" need not necessarily refer to land far downriver on this understanding. "Adjacent" can mean "not distant" or "nearby," <u>see</u> <u>Adjacent</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/adjacent (last visited May 13, 2021) (first definition), a definition that finds support in the very language the Intervenors point to -- "as nearly adjacent to the parcel taken as practicable." Thus, "along and adjacent to the Penobscot River" could refer to land both along the river and close to it.

Id. § 1722(n).  In doing so, though, the provision just takes us back to the question of whether the relevant area here -- waters included, but sans uplands -- was transferred.

In any event, there is reason to think that the state regulation of the river that Maine and the majority point to is not an "act" or "circumstance" that resulted in a "change in title to, possession of, dominion over, or control of" the river so as to effect a transfer.[42]  As the Penobscot Nation has pointed out, Maine also regulated -- and continues to regulate -- aspects of the uplands that are undisputedly part of the "Penobscot Indian Reservation."

And, even if one were to accept that the sort of state regulation that the State and the Intervenors point to could effect a transfer, a conclusion that the river itself was subject to such a transfer would leave empty the grant of sustenance fishing rights in § 6207(4) of the MIA to the Penobscot Nation "within the

---

[42]    The State relies on the interpretation of a similar transfer provision in the Rhode Island Indian Claims Settlement Act in Greene v. Rhode Island, 398 F.3d 45, 52 (1st Cir. 2005). But, as the Penobscot Nation points out, in Greene the Seaconke Wampanoag Tribe itself claimed to have been "dispossessed" of the lands at issue and does not seem to have occupied or controlled those lands even at the time the Union was formed.  See id. at 48, 50, 52.

For similar reasons, Maine's arguments based on the doctrines of laches, acquiescence, and impossibility also fail.  Maine relies on City of Sherrill v. Oneida Indian Nation, 544 U.S. 197 (2005), but the lands in that case had been out of tribal control for over 200 years.  See id. at 215-16.

boundaries of" its "Indian reservation[]."  Thus, while the MICSA controls in the event of a conflict between that federal statute and the MIA, 25 U.S.C. § 1735(a), I see no reason why we must read § 1723 of the MICSA to create a conflict when it is hardly clear that the text of the Settlement Acts mandates that result.

**E.**

To this point, my focus has been on the four corners of the MICSA and the MIA.  That focus reveals in my view that it is at the very least far from clear on the face of the overall statutory scheme that the definition of the "Penobscot Indian Reservation" in § 6203(8) of the MIA must be read as the majority reads it.  But, of course, that conclusion does not resolve the ultimate interpretive dispute at hand.  It just highlights that there is much interpretive work left to do -- in terms of consulting what the history shows regarding what was understood to have been reserved by the "agreement" to which § 6203(8) of the MIA refers, both at the time of that agreement and in the run-up to the enactment of the Settlement Acts that make reference to it. I thus now move on to undertake that further work.

**II.**

In Alaska Pacific Fisheries, the Court resolved the ambiguity in the text there at issue by broadening the view to include "[t]he circumstances in which the reservation was created," as the Court explained that these circumstances could

- 91 -

"shed much light on what Congress intended by 'the body of lands known as Annette Islands.'" 248 U.S. at 87-89. Following that same interpretive approach to the textual ambiguity present here, I will consider the relevant "circumstances" in which the settlement that produced these Acts was forged, as those circumstances, too, may "shed much light on," id. at 89, what the drafters of the Settlement Acts intended in using the words that they did in § 6203(8) of the MIA.

As I will explain, at a minimum, those circumstances reinforce the reasons to find the relevant words in the provision here at least as ambiguous with respect to whether the waters at issue are included as a textual analysis of them suggests that they are. Thus, at the very least, those circumstances support the application of the Indian canon in construing those words to resolve the ambiguity.

But, before reviewing the circumstances leading up to the Acts' passage, it first helps to get certain things straight about which specific circumstances are relevant to the Acts' proper construction and how they differ in certain respects from the circumstances that mattered most in Alaska Pacific Fisheries itself.

**A.**

In Alaska Pacific Fisheries, the Court explained that Congress, in defining that reservation as it did, was aware, among

- 92 -

other things, that "[t]he Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation" and that "[e]vidently Congress intended to conform its action to their situation and needs." 248 U.S. at 89. Many of those same circumstances are at least as present here, as we will see, given the Nation's historic ties to the river. In fact, the relevant statutory text here, unlike that at issue in Alaska Pacific Fisheries, describes an area that the tribe has inhabited since time immemorial.

But, as I have already explained, the relevant text does more than refer to a geographic feature to which the Nation has ties. That statutory text also indicates that the drafters of the Settlement Acts intended in defining the "Reservation" to preserve what had been "reserved . . . by agreement" prior to the Acts' passage.

Thus, the statute that contains the definition of the term at issue here would not only appear to direct us to consider what history shows regarding the Nation's past usages of the waters in question. It would also appear to direct us to consider past understandings of what rights the Nation had reserved as to those waters.

In that regard, it is important to keep in mind the following understanding in reviewing the relatively detailed history of the Nation's ties to the river that is set forth below:

§ 6203(8) of the MIA plainly sets forth what the term "Penobscot Indian Reservation" "means" with reference to treaties in which the Penobscot Nation gave up holdings centuries ago to Massachusetts and then to Maine. That is notable because those treaties did not themselves purport to be grants of rights from either of those states to the Penobscot Nation. Those treaties were by their terms grants of rights to prior holdings from the Penobscot Nation to those other sovereigns.

Thus, we must be wary of reading those treaties to establish the limits of what the Nation was reserving rather than to be merely specifying what it was relinquishing. Otherwise we will fail to grasp just what the parties to those agreements understood them to have accomplished. See United States v. Winans, 198 U.S. 371, 381 (1905) ("[T]he treaty was not a grant of rights to the Indians, but a grant of rights from them -- a reservation of those not granted. And the form of the instrument and its language was adapted to that purpose."); Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 680-81 (1979) (citing Winans, 198 U.S. at 380-81); Cohen's Handbook of Federal Indian Law § 2.02 (Nell Jessup Newton ed., 2017) (describing the "reserved rights doctrine").

It is equally important to keep in mind one more thing in reviewing the account of the history that follows. As I noted earlier, the Penobscot Nation does not argue that what was

"reserved . . . by agreement" necessarily includes all forms of "ownership" of the waters and submerged lands of the river at issue.[43] For example, the Nation has not, for purposes of this litigation, claimed a right to exclude non-tribal members from any of the waters of the Penobscot River or to control passage in those waters. Nor would the Penobscot Nation have "exclusive control of the Main Stem" -- the portion of the Penobscot River that includes the waters in question -- as the majority suggests, Maj. Op. 35, if those waters were within what § 6203(8) defines to be the "Penobscot Indian Reservation."

Under the Settlement Acts, the Penobscot Nation would have on its preferred reading of § 6203(8) of the MIA "exclusive authority . . . to promulgate and enact ordinances regulating . . . [h]unting, trapping or other taking of wildlife" within the relevant area of the river, because the MIA expressly grants the Nation that right in its "Reservation." See Me. Rev.

---

[43] The Penobscot Nation explained to the panel that in the proceedings before the District Court, its position was that its "circumscribed sustenance rights and related authorities" outlined in the second amended complaint "did not implicate riverbed ownership, but if they did, the Tribe's position was that it retained aboriginal title to the riverbed." The Nation explained that this is a "different concept than ownership" but nevertheless a largely semantic distinction given that "the Indians' right of occupancy is 'as sacred as the fee simple of the whites,'" County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 235 (1985) (quoting Mitchel v. United States, 34 U.S. (9 Pet.) 711, 746 (1835)).

Stat. Ann. tit. 30, § 6207(1)(A).[44]  And, violations of these and other tribal ordinances by tribal members within the portions of the Penobscot River at issue -- as well as certain criminal offenses committed by tribal members in these areas -- then would be within the exclusive jurisdiction of the Penobscot Nation (unless it chooses not to exercise such jurisdiction, in which case the state has jurisdiction), because, again, the MIA itself gives that measure of regulatory authority to the Nation within its "Reservation."  Id. §§ 6206(3), 6209-B(1).

There is no suggestion by the Nation here, however, that either the MIA or the MICSA would give the Nation additional rights if its understanding of § 6203(8) of the MIA were controlling.

---

[44]  Under the Settlement Acts, these ordinances must be "equally applicable . . . to all persons regardless of whether such person is a member of the [Penobscot Nation]," except that there may be "special provisions for the sustenance of individual members of the . . . Penobscot Nation." Me. Rev. Stat. Ann. tit. 30, § 6207(1).  This regulatory authority does not include regulating the taking of fish except on ponds "wholly within Indian territory and . . . less than 10 acres in surface area." See id. § 6207(1)(B), (3).  And, notwithstanding this authority, the Maine Department of Inland Fisheries and Wildlife is entitled to "conduct fish and wildlife surveys" within the Penobscot Indian Reservation and in some circumstances may exercise regulatory authority to prevent "significant depletion of fish or wildlife stocks on lands or waters outside the boundaries of lands or waters subject to regulation by . . . the Penobscot Nation or the [Maine Indian Tribal-State Commission]." Id. § 6207(6).

Section 6207(1) refers to Penobscot Indian territory, which, as I have explained, is broader than the "Penobscot Indian Reservation."  But, it is clear from the MIA that the relevant area of the river is within Penobscot Indian territory if and only if it is within the "Reservation." See id. § 6205(2).

Thus, we need to keep an eye only on the following in looking to the past:  Does the history suggest that those who drafted these Settlement Acts intended clearly to exclude all waters in the river from the definition of the "Penobscot Indian Reservation" in § 6203(8) of the MIA, such that the Penobscot Nation would not have the rights related to hunting, trapping, and taking wildlife in those waters that the MIA itself gives the Nation in that "Reservation"?

### B.

I begin by canvassing the history that bears on the nature of the Penobscot Nation's rights in the area in question before the Nation purported to cede any of those rights to either Massachusetts or Maine.  That inquiry, which is foundational to any understanding of what the Nation had "reserved" over the years, necessarily takes us quite far back in time.

### 1.

So far as the record reveals, from time immemorial the Penobscot Nation has centered its domain, originally consisting of many thousands of acres of territory in what today is the State of Maine, on the Penobscot River.  S. Rep. No. 96-957, at 11 (1980); H.R. Rep. No. 96-1353, at 11 (1980), reprinted in 1980 U.S.C.C.A.N. 3786, 3787 (stating that "[t]he aboriginal territory of the Penobscot Nation is centered on the Penobscot River" and its "land-

ownership orientation" is "riverine").[45]  In consequence, there is

little question that the Penobscot Nation had aboriginal title to

the lands in that area when the European colonists arrived in New

England in the early seventeenth century.  And there is little

question -- and certainly no contention to the contrary by the

State of Maine in this litigation -- that such aboriginal title

did encompass use and occupancy of the Main Stem of the Penobscot

River and not merely land masses (individual islands, which may

come and go over time) within it.  See County of Oneida v. Oneida

Indian Nation, 470 U.S. 226, 233-35 (1985) (explaining that "Indian

nations held 'aboriginal title' to lands they had inhabited from

time immemorial" while "discovering nations held fee title to these

lands, subject to the Indians' right of occupancy and use");

Leavenworth, Lawrence & Galveston R.R. Co. v. United States, 92

U.S. 733, 742-43 (1875).

Consistent with this understanding, the members of the

Penobscot Nation located their principal villages along that

portion of the river.[46]  And, in turn, the river provided the

Penobscot Nation with the main resources upon which its members

---

[45]    The Penobscot refer to themselves as Pa'nawampske'wiak,
or "People of where the river broadens out."

[46]    The Penobscot's principal village was variously called
Panawamskeag or Pem ta guaiusk took ("great or long River").

- 98 -

depended to live by way of fishing, hunting, and trapping, as well as a means of travel.

The river's foundational influence on the Penobscot Nation is also embedded in the Nation's language, culture, traditions, and belief systems. For example, Penobscot family names, ntútems ("totems"), reflect the creatures of the river: Neptune (eel), Sockalexis (sturgeon), Penewit (yellow perch), Nicola/Nicolar (otter), and Orno/Tama'hkwe (beaver). Each family group also has its own district known as nzibum, meaning "my river."

In addition, the river features centrally in the Penobscot Nation's creation myths and is linked to many water-based totem animals, including fish. This is articulated in its creation myth about Anglebému ("Guards the water"), the giant frog that gulped up all the water in the Penobscot River and was killed by Gluskábe, the Penobscot Nation's "culture hero," who then released the waters, rescued his "grandchildren," and settled "up the river."

Thus, it is evident that the Penobscot River and its natural resources were "not much less necessary to the existence of the [Penobscot Nation] than the atmosphere they breathed." Winans, 198 U.S. at 381. And so, when we consider -- as we next will -- the treaties that the Penobscot Nation purported to make with Massachusetts and Maine regarding its aboriginal holdings in

subsequent years, we must do so with this understanding of the nature of the Penobscot Nation's ties to the river. It would be strange to construe those agreements -- and the reservations that the Nation made in them -- without doing so, for I can see no reason to interpret the terms of those agreements as if the Penobscot Nation were, in entering into them, as indifferent to preserving its sovereign rights in the river as Maine now appears to suggest that we must understand the Nation to have been.

**2.**

We consider first the various late seventeenth- and early eighteenth-century peace treaties between the Penobscot Nation and the British provinces. In them, the Penobscot Nation and other tribes in the same general area agreed to "cease and forbear all acts of Hostility," acknowledged themselves as lawful subjects of Great Britain, and agreed to British colonists' use and possession of the colonists' former settlements and properties. See Treaty of Portsmouth, July 13, 1713, reprinted in Penhallow's Indian Wars 74 (Edward Wheelock ed., 1924); Dummer's Treaty, Dec. 15, 1725, reprinted in 3 Collections of the Maine Historical Society 416 (Portland, Brown Thurston 1853).

But, notably, these treaties also "sav[ed] unto the Indians their own Ground," Treaty of Portsmouth, supra, at 76; Dummer's Treaty, supra, at 417-18 ("Saving unto the Penobscot . . . all their Lands, Liberties and Properties not by

- 100 -

them conveyed or Sold to or Possessed by any of the English Subjects as aforesaid, as also the Priviledge of Fishing, Hunting, and Fowling as formerly."). And, subsequent events provide some idea of what those reserved Penobscot "lands" were understood to be.

In 1775, for example, a committee report of the third Provincial Congress of Massachusetts "forb[ade] any person or persons whatsoever[] from trespassing or making waste[] upon any of the lands and territories, or possessions, beginning at the head of the tide on Penobscot river, extending six miles on each side of said river, now claimed by our brethren, the Indians of the Penobscot tribe." The Journals of Each Provincial Congress of Massachusetts in 1774 and 1775, at 371 (Boston, Dutton & Wentworth 1838). The report also noted the "friendship and assistance" offered by the Penobscot in the war with Great Britain. Id. Indeed, a subsequent treaty, which Colonel John Allan of the Massachusetts militia negotiated with the Penobscot Nation and other Maine tribes on June 23, 1777, promised to the Penobscot the protection of their territory in exchange for their assistance in the Revolutionary War. S. Rep. No. 96-957, at 11-12; H.R. Rep. No. 96-1353, at 11-12. Crucially for present purposes, however, that treaty contained no terms that divested the Penobscot Nation of any of its aboriginal lands or sovereign rights and so does not

itself provide any basis for concluding that the Penobscot Nation had no claim to the river as of that date.

There followed nearly twenty years later a 1796 treaty between representatives of the Penobscot Nation and officials from the State of Massachusetts (Maine still not yet being a state). That treaty, for the first time, did involve a putative cession of land by the Penobscot Nation.

Despite the Nonintercourse Act being in effect at that time, this land cession was not approved by Congress. See Trade and Intercourse Act of 1793, 1 Stat. 329, 330 (codified as amended at 25 U.S.C. § 177) ("[N]o purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution . . . ."). But, this agreement purported nonetheless to provide in exchange for "[o]ne hundred and forty nine and a half yards blue cloth for blankets, four hundred pounds of shot, one hundred pounds of Powder, thirty six hats, thirteen bushels of Salt . . . , one barrel of New England Rum, and one hundred bushels of corn," to be delivered upon signing the treaty, as well as similar specified items every year thereafter, "so long as [the Penobscot Nation] shall continue to be a nation and shall live within this Commonwealth," that the Penobscot Nation would cede a thirty-mile

tract, six miles wide, of "all the lands on both sides of the River Penobscot . . . excepting however, and reserving to the [Penobscot Nation], all the Islands in said River, above Old Town, including said Old Town Island, within the limits of the said thirty miles." Treaty Between the Penobscot and Massachusetts, Aug. 8, 1796, in 2 Documents of American Indian Diplomacy 1094, 1094 (Vine Deloria, Jr. & Raymond J. DeMallie eds., 1999).

There is no question that the Nation gave up a fair amount through this treaty -- seemingly for not much in return. But, the terms of this treaty in no sense indicate that the Nation was relinquishing rather than reserving its historic rights to use and occupancy of the river itself or its longstanding sovereign rights relating to hunting and fishing therein.

Indeed, in June 1797, the then-Governor of Massachusetts, Increase Sumner, reported in his executive address to the Massachusetts General Court (the Massachusetts Legislature) that a delegation of Penobscot representatives had rightly complained to state officials of settler incursions that had "almost deprived [the Penobscot] of the Benefit of their Salmon Fishery." Acts and Laws of the Commonwealth of Massachusetts 653 (Boston, Young & Minns 1896) (emphasis added). And, consistent with that same understanding, in 1807, a delegation of the Penobscot Nation headed by its Chief, Attian Elmut, met with Massachusetts Governor James Sullivan to seek protection of the

Nation's fishing rights on the river next to its head village on Old Town. A notetaker quoted Chief Attian as saying, "the God of Nature gave them their fishery, and no man without their consent has a right to take it from them." Wabanaki Homeland and the New State of Maine: The 1820 Journal and Plans of Survey of Joseph Treat 43 (Micah A. Pawling ed., 2007) (emphasis added). Thereafter, in 1812, following attempts by multiple other Penobscot Nation delegations to obtain redress for incursions upon these fisheries, the Massachusetts legislature responded with protective legislation.

This is the history, then, that supplied the context for when representatives of the Penobscot Nation entered into the treaty with officials from Massachusetts -- Maine still not yet being a state in its own right -- that serves as the MIA's specific reference point: the one signed on June 29, 1818. It, too, was made without congressional approval and in apparent contravention of the Nonintercourse Act. But, the treaty was sealed by the payment of four hundred dollars, in addition to "one six pound cannon, one swivel, fifty knives, six brass kettles, two hundred yards of calico, two drums, four fifes, one box pipes, three hundred yards of ribbon, and [the receipt of certain similar articles] . . . every year, so long as they shall remain a nation, and reside within the commonwealth of Massachusetts." 1818 Treaty, supra, at 253, 255. And, in exchange for that seemingly minimal

consideration, the Penobscot Nation ceded "all the lands they claim, occupy and possess by any means whatever on both sides of the Penobscot river, and the branches thereof, above the tract of thirty miles in length on both sides of said river, which said tribe conveyed and released to said commonwealth" by the treaty of 1796. Id. at 253-54.

This treaty, then, purported to confirm the prior limited cession of lands in the 1796 treaty and to cede more lands "on both sides of the . . . river." It did not, however, give any more of a hint that it disclaimed the Penobscot Nation's historic rights to the river than the earlier treaty had. Indeed, this treaty expressly stipulated that reserved for the Penobscot Nation to "enjoy and improve" were four townships and "all the islands in the Penobscot river above Oldtown and including said Oldtown island." Id. at 254.[47]

---

[47] The text of the 1818 treaty, unlike its predecessor, did specifically provide that "the citizens of [Massachusetts] shall have a right to pass and repass any of the rivers . . . which run through any of the lands hereby reserved, for the purpose of transporting their timber and other articles through the same." 1818 Treaty, supra, at 255 (emphasis added). The parties dispute the import of this provision. According to the Penobscot Nation, it must refer to the Penobscot River. To the extent it does so, it reinforces an area-based reading given that the river does not "run through" any of the uplands but instead "run[s] through" the area comprising them, suggesting that the "lands hereby reserved" include that area. For its part, the State argues that this language was only necessary given that in the 1818 treaty the Penobscot Nation also reserved the four townships (which were, as we will see, later ceded to Maine). The "right to pass and repass any of the rivers, streams, and ponds, which run through any of

- 105 -

Reflective of that understanding, in a colloquy thereafter in July of 1820 between representatives of the Penobscot Nation and officials from the new state of Maine -- once Maine had separated from Massachusetts and gained statehood and was therefore to assume Massachusetts's treaty obligations -- John Neptune, representing the Penobscot Nation, again protested incursions into the river affecting the Penobscot Nation: "The white people take the fish in the river so they do not get up to us. They take them with weirs; they take them with dip-net. They are all gone before they get to us. The Indians get none." History of Penobscot County, Maine 593 (Cleveland, Williams, Chase & Co. 1882). Then-Governor of Maine William King agreed that the protest was justified, replying that the Penobscot Nation's complaint would be "attended to." XVIII Niles' Weekly Register 563 (Baltimore, Franklin Press 1820).

---

the lands hereby reserved," Maine argues, was an "affirmative grant to non-tribal members" to pass through the waters running through those reserved townships. Maine does not point to any rivers running through those townships, much less ones that would have been important in timber transportation, as the record makes clear that the Main Stem of the Penobscot River was. But, it is true that per the 1818 treaty, the first reserved township "cross[ed] the mouth of the Mattawamkeag river." Id. at 254. Thus, the treaty provision granting a "right to pass" is not a conclusive indication that the 1818 treaty contemplated a reservation of the area comprising the islands, including their attendant waters. Nonetheless, the fact that the provision could still have meaning even if it did not refer to the waters surrounding the reserved uplands hardly eliminates the ambiguity that inheres in what was "reserved" in the 1818 treaty.

The following month, on August 17, 1820, Penobscot leaders signed two more treaties. Together, these treaties released Massachusetts from its obligations under the 1818 treaty and substituted the new state of Maine in its place. But, they did not suggest that the Nation was relinquishing what it had retained to that point.

The 1820 treaty with Maine provided that the Penobscot Nation "shall have and enjoy, all the reservations made to them, by virtue of" the 1818 treaty while any "lands, rights, immunities or privileges" held by Massachusetts pursuant to the 1818 treaty would be transferred to Maine. Wabanaki Homeland, supra, at 289. And, notably, in 1821, Neptune, after having raised concerns about the Penobscot Nation's fishing rights before the Nation signed the 1820 treaty with Maine, followed up with a petition to the Maine Legislature in which he stated that

> [T]he waters of our Penobscot River was one of the greatest sources by which they obtained their [living] . . . . But . . . our brethren the white Men who live near the tide waters of our River every year built so many weares . . . and killed so[ ]many of the fish that there is hardly any comes up the River where we live so that we cannot [c]atch enough for the use of our families . . . . We have asked the general Court at Boston to make laws to stop the white people from building wares and they have made Laws but they have done [us] no good . . . . [N]ow we ask you to make a Law to stop the white folks . . . .

There is no record of the Maine Legislature responding with protective legislation, as Massachusetts had done. But, in 1833, the State of Maine purchased for $50,000 from the Penobscot Nation -- again without the requisite federal approval for such a land purchase -- four townships on the banks of the Penobscot River that had been reserved for the Penobscot Nation's "perpetual use" in the prior treaties.

**3.**

There were no more "agreements" between the Penobscot Nation and the States of Massachusetts and Maine, and such developments as occurred over the course of the next century are not especially clarifying with respect to the issue that is our concern. But, to the extent they do shed light, they underscore how difficult it is to find any clear indication that the parties to any of the past agreements understood the Penobscot Nation to have given up all claims to sovereign rights in the waters at issue.

The State of Maine did pass legislation over the course of these years that authorized the construction and operation of log booms, piers, and dams in the Main Stem of the Penobscot River, and lumber companies built lumber mills on and over parts of the Main Stem during that same time. See Penobscot Nation, 151 F. Supp. 3d at 201-02. It is also undisputed that this construction

happened without any lease or other grant from the Penobscot Nation.

But, the record shows that the Penobscot Nation itself signed leases for dam and mill owners to build on some of the islands near Old Town. And, those leases reserved fishing rights for the Nation and required that fish passages be left open. The leases also specifically allowed for the grantees' use of parts of the river itself -- including "coves and eddies," river ledges, and other landmarks within the channel of the river. Throughout this period, moreover, the Penobscot continued to engage in fishing, hunting, and trapping from the river and to pass between its islands on the river.

This somewhat mixed picture of the understandings that prevailed following the treaties is in itself significant. As we have seen, the history that led up to the forging of the last treaty involving the Penobscot Nation hardly supports an uplands-only understanding of what had been reserved to the Nation up until that time. It is thus hard to see how what followed does so with any clarity.[48]

---

[48] The Intervenors do argue that the river (or even a right to use and occupancy of its waters of a sort that the Penobscot Nation now asserts) could not have been part of what was "reserved," given that -- whatever its aboriginal holdings may once have been -- the Nation ceded the river as early as the 1713 treaty. But, the history just recounted -- including the very fact of the later treaties -- and what it shows about the parties' understandings disposes of the Intervenors' argument that the 1713

C.

In sum, the "circumstances," <u>Alaska Pac. Fisheries</u>, 248 U.S. at 87-89, that formed the backdrop for the Settlement Acts suggest at a minimum that it is plausible that Congress, Maine, and the Penobscot Nation understood the Nation to have "reserved . . . by agreement," through the limited (but substantial) cessions of lands "on both sides of the . . . river" that were made, the Nation's use of the river and its historic sovereign rights with respect to fishing, trapping, and hunting therein. <u>See</u> <u>Winans</u>, 198 U.S. at 381. Thus, these circumstances support -- even if they do not compel -- an understanding of the phrase "islands in the Penobscot River reserved to the Penobscot Nation by agreement" in the MIA's definition of the "Penobscot Indian Reservation" that would include the area comprising the islands and not simply the uplands.

Given that such an understanding results in a reading of § 6203(8) of the MIA that is just as inclusive of the waters in that area as is the "reservation[]" to which the majority agrees

_____

treaty can be understood to have divested the Penobscot Nation of all of its aboriginal holdings.

The majority also characterizes as "disputed" the assertion that the Nation did not give up any rights to the river in the 1796 and 1818 treaties. Maj. Op. 22. But, no party has argued that the Nation gave up rights to the river in either of those treaties, and the majority does not explain the source of this dispute or how the text of either treaty makes this point disputable.

- 110 -

that § 6207(4) of that same statute refers, I can see no reason why we would not then be confronted at the very least with an ambiguity in § 6203(8) to which the Indian canon would apply. And, if we were to apply that canon, we then would be required to construe the term that it purports to define -- "Penobscot Indian Reservation" -- in the waters-inclusive, area-based manner that the Penobscot Nation favors, with all the follow-on consequences that would entail under the Settlement Acts.

In fact, for that not to be the case, either of two things would have to be true. The legislative history of the Settlement Acts would have to compel us to conclude what the statutory text itself does not: that the definition of the "Reservation" in § 6203(8) of the MIA was intended to encompass only the uplands of the islands at issue. Or, alternatively, the Indian canons simply would have to have no application in this context. I thus now wind up the analysis by considering each possibility.

## III.

The majority does conclude, in an independent holding, that the legislative history in and of itself compels the uplands-only reading. But, I cannot agree.

## A.

The majority asserts that it would be odd for legislation purporting to settle the Maine tribes' land claims to resolve title

- 111 -

disputes by ratifying reservations in prior agreements without explaining what the reservations in those agreements were. See Maj. Op. 28-37. After all, why would the drafters have wanted to make consideration of the complicated history necessary, especially given that the disputes concern a navigable waterway? For this purpose-based reason, the majority contends that it makes sense to read § 6203(8) of the MIA -- to which the MICSA directs the reader to find the definition of "Penobscot Indian Reservation" -- to encompass only the uplands. That reading, after all, lays to rest any disputes about what rights to the waters the Nation retains within the "Reservation" by making clear that no such waters lie within it.

This argument disregards, however, the fact that the Settlement Acts were a response to potential land claims to areas that were "ceded" by the Maine tribes -- up to two-thirds of the area of what is now the State of Maine, see Passamaquoddy Tribe v. Maine, 75 F.3d 784, 787 (1st Cir. 1996) -- without regard to the Nonintercourse Act. In other words, the dispute being settled was, in the main, about whether the putative treaty-based cessions of lands "on both sides of the Penobscot river" themselves were to be given legal effect. It was not about the dispute that is front and center in this litigation, which concerns only whether what had been "reserved . . . by agreement" in the treaty making those

cessions of land included the area comprising the islands or only the uplands in that area.

Thus, it is hardly implausible that the drafters thought it sufficient to accomplish their chief task -- settling potentially dramatically destabilizing land claims -- to use the 1818 agreement between the Nation and Massachusetts as the reference point. That agreement clearly established that land "on both sides of the . . . river" had not been "reserved" by the Nation. See 1818 Treaty, supra, at 253-54.

This understanding, which would take the drafters to have been relying on past understandings reflected in that treaty, is even less implausible when one considers the repeated references in the legislative history that reflect comfort with the notion that the Nation would retain sovereign rights relating to hunting and fishing. Congress's final committee reports provide that the MICSA would extinguish the Nation's land claims resulting from the purported invalidity of the land transfers. But, the reports also expressly describe the settlement as providing that "the Penobscot Nation will retain as reservations those lands and natural resources which were reserved to them in their treaties with Massachusetts and not subsequently transferred by them." S. Rep. No. 96-957, at 18 (emphasis added); H.R. Rep. No. 96-1353, at 18. Those committee reports further explain that the Nation will "retain[] sovereign activities," including those relating to

- 113 -

hunting and fishing, under the Settlement Acts.  S. Rep. No. 96-957, at 15; H.R. Rep. No. 96-1353, at 15.

It is also notable that the legislative history does not evidence a legislative understanding -- let alone a clear one -- that the Nation was relinquishing those rights in the waters relating to hunting and fishing that it had long claimed as an aspect of its sovereignty.  To the contrary, Congress heard testimony from members of the Penobscot Nation about the waters' importance, including testimony from a tribal member who relied on food sources from the river to feed her children, explaining that her son "fishes my islands," meaning that he fished from a canoe in the waters surrounding the islands.  And though members of the Penobscot Nation testifying before Congress expressed concerns that settlement provisions might be construed to destroy the Nation's "sovereign rights," in particular those related to hunting and fishing and the Nation's culture, the committee report for the MICSA called these concerns "unfounded" and emphasized that the hunting and fishing provisions in the MIA recognized the Penobscot Nation's "inherent sovereignty" and were "examples of expressly retained sovereign activities."  S. Rep. No. 96-957, at 14-15; H.R. Rep. No. 96-1353, at 14-15.

That part of the legislative history is important for present purposes.  As I have explained, § 6207(4) of the MIA, in securing sustenance fishing rights to the Penobscot Nation "within

the boundaries" of its "Indian reservation[]," is plainly referring to the area comprising the islands in the Penobscot River that are the very same "islands" referenced in § 6203(8) of the MIA. That being so, it is hard to see how this part of the legislative history supports the construction of § 6203(8)'s definition of the "Reservation"'s boundaries, landlocked as it would make them, that Maine urges us to adopt.

But, the case for rejecting Maine's position regarding the legislative history is even stronger when one considers what that history most conspicuously does not disclose -- any suggestion whatsoever that the "reservation[]" referenced in § 6207(4) of the MIA is not the "Penobscot Indian Reservation" defined in § 6203(8) of that same statute. That is quite an omission if -- in order to clarify things in the face of title disputes -- the legislature must have intended for the latter definition to be an uplands-only one and the former to be a waters-inclusive one.

The omission becomes all the harder to explain -- if one accepts the majority's view of the definition in § 6203(8) of the MIA -- when one considers still other features of the legislative history. Those features underscore the reasons that I have already given to doubt that the drafters of the MIA meant to refer to two distinct Penobscot Nation reservations rather than merely one in two different provisions of that statute.

For example, in a public hearing held by the Maine Legislature's Joint Select Committee on Indian Land Claims in March 1980, the tribes' attorney explained that the exercise of "tribal powers in certain areas of particular cultural importance such as hunting and fishing" was an issue that had been important for the State to understand in negotiations. See Hearing on L.D. 2037 Before the Joint Select Comm. on Indian Land Claims, 109th Leg., 2d Sess. 25 (Me. 1980). The Committee heard concerns about hunting and fishing from non-tribal members, too. A member of the Atlantic Seamen's Salmon Commission expressed concern that "critical parts of the Penobscot River" would "fall within the confines of the Settlement," which "could spell danger to the salmon." Id. at 117-18. But, significantly, rather than refuting this premise, Maine's Deputy Attorney General explained:

> Currently under Maine Law, the Indians can hunt and fish on their existing reservation for their own sustenance without regulation of the State. That's a right which the State gave to the Maine Indians on their reservations a number of years ago and the contemplation of this draft was to keep in place that same kind of right . . . .

Id. at 55-56 (emphases added).

It is also worth noting that those aspects of the legislative history suggesting that the Penobscot Nation did not have fee title to the submerged lands are not inconsistent with the idea that the Settlement Acts codified the use- and occupancy-

- 116 -

based hunting and fishing rights that the Penobscot Nation had long enjoyed, which are all the Nation must establish that it reserved to prevail in the present litigation. See Winans, 198 U.S. at 381; Cohen's Handbook § 18.01 (explaining that aboriginal title includes "component hunting, fishing, and gathering rights"); id. § 15.02 ("An Indian reservation is a place within which a tribe may exercise tribal powers, but not all land within a reservation may belong to the tribe."). And, according to the Penobscot Nation's negotiators, the Penobscot Nation had maintained through the negotiations that it retained aboriginal title to the waters of the Main Stem in the area comprising the islands referenced in § 6203(8).

True, the stated purposes of the MICSA include "remov[ing] the cloud on the titles to land in the State of Maine resulting from Indian claims" and "clarify[ing] the status of other land and natural resources in the State of Maine." 25 U.S.C. § 1721(b). True as well, the U.S. Department of the Interior's Federal Register notice describes the MICSA as "extinguish[ing] any claims of aboriginal title of the Maine Indians anywhere in the United States and bar[ring] all claims based on such title." Extinguishment of Indian Claims, 46 Fed. Reg. 2390, 2391 (Jan. 9, 1981).

But, as I have explained -- and as the extensive history that I have reviewed makes clear -- the Settlement Acts responded

- 117 -

to aboriginal title claims to the land that was ceded in the eighteenth- and nineteenth-century agreements. See 25 U.S.C. § 1721(a)(1). There is no indication that the Settlement Acts were intended to upset use- and occupancy-based sovereign rights in those areas not previously ceded in the suspect agreements -- at least insofar as those rights are no broader than the ones recognized in the Settlement Acts themselves as ones that the Nation would retain in its "Reservation." To the contrary, the focus in the federal legislative history on the Penobscot Nation's retained sovereignty with respect to activities that could only occur within the waters in question -- such as, for example, the activity that is the subject of § 6207(4) itself -- suggests that upsetting those rights was not the intended result.

The rights that the Penobscot Nation claims, moreover, are a function of the substantive provisions of the Settlement Acts themselves. The federal legislative history just canvassed shows that these provisions of those Acts -- which ensure that the Penobscot Nation can exercise within its "Reservation" the rights related to the taking of wildlife that it claims in this litigation -- are best understood as encompassing the area in which the Nation has long exercised these rights.

Thus, the legislative history does not support the purpose-based assertion that the majority makes about why the definition of "Penobscot Indian Reservation" in § 6203(8) of the

MIA must be construed to exclude altogether everything but the uplands. Rather, that legislative history at most merely underscores the ambiguity that arises from the reference in that provision to what was "reserved . . . by agreement," given the waters-inclusive reference to the "Penobscot Nation . . . Indian reservation[]" in § 6207(4) of that same statute.

In sum, a purpose to clear title to lands and natural resources that have been transferred cannot itself reveal what was understood to have been transferred, and the Penobscot Nation seeks here only to ensure that the Nation will enjoy the same sovereign rights over taking wildlife in the waters in question that the Settlement Acts plainly give the Nation throughout the Penobscot Indian Reservation. I thus do not see how a recognition of those limited rights can be said to be beyond the comprehension of the drafters of these measures when the legislative history reveals the repeated contemplation of just such recognition.

**B.**

The majority does also conclude, less generally, that the legislative history shows that the legislature deliberately included only the uplands of the islands in the "Reservation." See Maj. Op. 35 n.17. But, here, too, the evidence is weaker than advertised.

In a "background" paper that the U.S. Department of the Interior included in a hearing submission to the House Committee

on Interior and Insular Affairs, the Penobscot Nation was described as having a "4,000 acre reservation on a hundred islands in the Penobscot River." Had the entire Main Stem been included, bank-to-bank, the majority concludes, the reservation would be 13,760 acres. Maj. Op. 35 n.17.

In support of its contention that this point is a salient one, the State cites Idaho v. United States, 533 U.S. 262 (2001). There, the Court used as evidence of the intent to include submerged lands in a reservation the fact that the acreage description in a government survey purporting to define the reservation's total area "necessarily included" submerged lands. Id. at 267, 274. As the Penobscot Nation and the United States point out, however, citing examples from the website for the Maine Department of Inland Fisheries and Wildlife, "it is not unusual to specify only upland acreage when adjacent submerged lands also are within the boundaries." Therefore, there is a weaker inference to be drawn from an acreage description that excludes submerged lands than from one that necessarily includes submerged lands. Cf. id. at 267. Moreover, in Idaho the acreage description came from a formal survey of the reservation that was undertaken by the United States for the very purpose of setting the reservation boundaries and "fix[ing] the reservation's total area." Id. The brief reference to acreage included in the hearing submission, in

contrast, cannot bear the weight the majority or the State would put on it.

Similarly, a map was provided to the Senate in the run-up to the MICSA's enactment that shaded only the islands and not the river in the color denoting the "Reservation."[49]  But, that map was introduced into the record for purposes of identifying the newly acquired <u>trust</u> lands under the settlement, not to define the boundaries of the existing reservation.  <u>See</u> <u>Proposed Settlement of Maine Indian Land Claims:  Hearing on S. 2829 Before the S. Select Comm. on Indian Affairs</u>, 96th Cong. 282 (1980) (statement of Sen. William S. Cohen, Member, S. Comm. on Indian Affairs) (requesting a "map of the State of Maine designating the areas that are now under consideration for sale" and stating that such a map "should become a part of the record as far as what areas are being contemplated for sale and what range of parcels are being contemplated for purchase").  Particularly in these circumstances, the shading hardly indicates that Congress understood the Penobscot Nation to retain no reservation-based rights in the Main Stem.

---

[49]    The District Court found that pursuant to the map's key, the islands in the Main Stem were shaded in red, which represented "Indian Reservation," and the Main Stem was shaded in white, which represented "river and lakes adjacent to settlement lands." <u>Penobscot Nation</u>, 151 F. Supp. 3d at 194, 218.

## c.

The post-enactment history of the Settlement Acts reinforces this same understanding.  It cannot reveal a legislative meaning not otherwise indicated, but it does usefully give some indication of the understandings that prevailed at the time of the Settlement Acts' passage.  Those understandings comport with the understanding of the "Reservation" boundaries that the Penobscot Nation favors.  See Alaska Pac. Fisheries, 248 U.S. at 89-90 (citing, as support for the conclusion that the reservation included the adjacent waters, the fact that "the statute from the time of its enactment has been treated . . . by the Indians and the public as reserving the adjacent fishing grounds as well as the upland, and that in [post-enactment] regulations prescribed by the Secretary of the Interior . . . the Indians are recognized as the only persons to whom permits may be issued for erecting salmon traps at these islands"); cf. McGirt v. Oklahoma, 140 S. Ct. 2452, 2469 (2020) (explaining that the Supreme Court has recognized "that '[e]vidence of the subsequent treatment of the disputed land'" may play a limited interpretive role "to the extent it sheds light on what the terms found in a statute meant at the time of the law's adoption" (alteration in original) (quoting Nebraska v. Parker, 577 U.S. 481, 493 (2016))).

**1.**

Consider that the Penobscot Nation began operating its own warden service in 1976, <u>Penobscot Nation</u>, 151 F. Supp. 3d at 196-97, largely through federal funding from the U.S. Department of the Interior for the Nation's exercise of governmental authority on "Reservation lands and waterways,"[50] and that the Nation continued doing so <u>after</u> the Settlement Acts were enacted. In fact, since 1982, Penobscot Nation wardens have been cross-deputized under state law to "have the powers of [state] game wardens" within "Penobscot Indian Territory." Me. Rev. Stat. Ann. tit. 12, § 10401; 1981 Me. Laws 1886, 1887; <u>see also</u> <u>Penobscot Nation</u>, 151 F. Supp. 3d at 197.

To be sure, in the years following the Settlement Acts, Maine and Penobscot Nation game wardens collaborated on some patrols and enforcement actions in the Main Stem. <u>Penobscot Nation</u>, 151 F. Supp. 3d at 197. According to affidavits of state game wardens, those wardens enforced Maine fish and game laws

---

[50] The Penobscot Nation has consistently received federal funding related to the river. For example, in 1993, the Penobscot Nation received funding for a water resources management program that included monitoring of the Penobscot River. <u>Penobscot Nation</u>, 151 F. Supp. 3d at 212. In 1999, the Nation received funding to educate tribal members on the risks of consuming contaminated fish, in light of the fact that tribal members continued to rely on the river to feed their families. <u>Id.</u> And, in 2007 and 2010, the Nation again received funding for game warden patrols, acknowledging that the tribe patrolled in the Penobscot River. <u>Id.</u>

against tribal and non-tribal members. But, the record shows, in 1990, when state game wardens responded to a report involving a tribal member deer hunting from a boat in the Penobscot River in violation of state hunting regulations, the state wardens contacted Penobscot Nation wardens, and the tribal member was ultimately turned over to Penobscot Nation wardens for prosecution in the Tribal Court after an initial joint investigation.[51] See id. at 209. Thus, this aspect of the post-enactment history accords with a conclusion that the Settlement Acts were not understood to have conferred to Maine full authority with respect to hunting, trapping, and fishing in the relevant waters, such that the Nation was divested of them.

## 2.

Other post-enactment developments and representations by state officials support this same conclusion. For example, eight years after the Settlement Acts were negotiated and went into effect, an issue arose as to the application within the river of state-wide rules against the use of gill nets to harvest fish. See id. at 199. Members of the Penobscot Nation wanted to use

---

[51] The Penobscot Nation's exercise of jurisdiction suggests that the river was understood to be within the "Reservation" in part because the Settlement Acts gave the Penobscot Nation exclusive jurisdiction over certain criminal offenses committed on the Penobscot Indian Reservation by a tribal member. The Tribal Court would not have had jurisdiction over a crime not committed on its reservation. See 1989 Me. Laws 249-50; 1979 Me. Laws 2404.

gill nets to fish in the Penobscot River, within what they understood to be part of the "Reservation," as was consistent with the Nation's traditional practices and permitted under its own regulations.

In a letter dated February 16, 1988, Maine Attorney General James E. Tierney opined that the Penobscot Nation's use of gill nets was permissible:

> In the opinion of this Department, . . . [p]ursuant to Section 6207(4) of the [MIA], members of the . . . Penobscot Nation are authorized to take fish, within the boundaries of their . . . Indian Reservation[], and "notwithstanding any rule or regulation promulgated by the Commission or any other law of the State," so long as the fish so taken are used for "their individual sustenance."

Letter from James E. Tierney, Att'y Gen. of Me., to William J. Vail, Chairman, Atl. Sea Run Salmon Comm'n (Feb. 16, 1988).  There was notably no indication in this response that the "Indian Reservation[]" to which he referred was not the one defined in § 6203(8).  Indeed, the capitalized reference to the "Reservation" appears to reflect the understanding that they were the same.

Similarly, in the mid-1990s, Maine issued permits for eel pots in waters of the Penobscot River that provided that "[t]he portions of the Penobscot River and submerged lands surrounding the islands in the river are part of the Penobscot Indian Reservation and [gear] should not be placed on these lands without permission from the Penobscot Nation."  Penobscot Nation, 151 F.

Supp. 3d at 199. Again, it is hardly logical to think that this reference to the "Penobscot Indian Reservation" meant something different than that term as defined in § 6203(8) of the MIA.

In fact, the Penobscot Nation maintained in the years following the Settlement Acts its own permitting system and issued permits to non-tribal members for duck hunting and eel trapping in the relevant waters. And, the Penobscot Nation passed regulations concerning tribal members' sustenance fishing in those waters.[52]

Illuminating, too, are the disputes that arose in the 1990s over the relicensing of hydro-electric dams on the Penobscot River. In proceedings before the Federal Energy Regulatory Commission ("FERC"), Bangor Pacific Hydro Associates and various papermaking companies with facilities located in or near the river asserted the position that the river was outside the reservation boundaries. Then-Chair of the Maine Indian Tribal-State Commission Bennett Katz, who was Majority Leader of the Maine Senate at the time of the MIA's passage, explained in a letter to FERC that this was "the first time these particular arguments ha[d] come to the attention of the Commission" and that, "[t]o [his] knowledge, the State ha[d] never questioned the existence of the right of the Penobscot Indian Nation to sustenance fishing in the

---

[52] Consistent with the Settlement Acts, the Penobscot Nation is not seeking here to regulate fishing other than tribal members' sustenance fishing.

- 126 -

Penobscot River."  Letter from Bennett Katz, Chair, Me. Indian Tribal-State Comm'n, to Lois Cashell, Sec'y, Fed. Energy Regul. Comm'n (Nov. 1, 1995).  Moreover, he stated that he could not "imagine that [such a restrictive] meaning was intended by [his] colleagues in the Legislature who voted in support of the Settlement."  Id.

Indeed, the State of Maine subsequently expressed its view in a brief to FERC that "Penobscot fishing rights under the [MIA] exist in that portion of the Penobscot River which falls within the boundaries of the Penobscot Indian Reservation," which "may generally be described as including the islands in the Penobscot River above Old Town . . . and a portion of the riverbed between any reservation island and the opposite shore."  State of Maine's Response to the Department of the Interior's April 9, 1997 Filings Pursuant to Sections 4(e) and 10(e) of the Federal Power Act at 12-13, Project No. 2534 (FERC May 29, 1997).  So, there, too, the equation between the "reservation[]" referenced in § 6207(4) of the MIA and the "Reservation" referenced in § 6203(8) of that statute seemed to be one that came naturally even to Maine itself.

### 3.

There is still more evidence from these years that it was not thought that the Settlement Acts defined an uplands-only "Reservation."  Also in the 1990s, the Penobscot Nation began

- 127 -

lobbying the U.S. Environmental Protection Agency ("EPA") for water quality standards that would protect the Nation's right to sustenance fish in the Main Stem. Penobscot Nation, 151 F. Supp. 3d at 207. Maine's Attorney General wrote to the EPA asserting that the sustenance fishing rights established in the Settlement Acts did "not guarantee a particular quality or quantity of fish." Letter from Andrew Ketterer, Att'y Gen. of Me., to John DeVillars, Reg'l Adm'r, Env't Prot. Agency (June 3, 1997). But, notably, in the course of that letter, he did not reject the view that the Nation had rights in the waters owing to its rights to the islands, stating that "[a]lthough there may be a certain portion of the river bed that goes along with the ownership of an island in the river, . . . ownership of a portion of the bed does not constitute ownership of the 'river.'" Id.

There is, finally, a 2006 brief to this Court involving Maine's environmental regulatory authority concerning discharges into the river. Maine acknowledged there that there was "strong[] disagree[ment]" between the parties -- the State, the Penobscot and Passamaquoddy Tribes, and the federal government -- concerning the "boundaries of Indian Territory in the Penobscot basin." Brief of Petitioner State of Maine at 58, Johnson, 498 F.3d 37 (Nos. 04-1363, 04-1375). But, in that same litigation, the State made clear that it viewed the definition of the "Reservation" in the Settlement Acts as including the "accompanying riparian rights" to

the islands that "have not been transferred."  Brief of State of Maine as Intervenor-Respondent at 3 n.2, Johnson, 498 F.3d 37 (Nos. 04-1363, 04-1375).  This statement, though not a concession of the point in dispute here, is also in no sense a clear embrace of the uplands-only view now said to be crystal clear in § 6203(8).

In fact, it was only when, around 2012, the Maine Commissioner of Inland Fisheries and Wildlife and the Colonel of Maine's Warden Service requested an opinion from the Maine Attorney General addressing the "respective regulatory jurisdictions" of the Penobscot Nation and the State "relating to hunting and fishing on the main stem of the Penobscot River" that the uplands-only view became Maine's in any clear way.  Att'y Gen. of Me., Opinion Letter (Aug. 8, 2012).  In a formal opinion issued on August 8, 2012, Maine Attorney General William Schneider adopted the interpretation of the MIA that Maine had previously disavowed when it was proposed by the paper companies in the FERC proceedings -- that "the River itself is not part of the Penobscot Nation's Reservation, and therefore is not subject to its regulatory authority or proprietary control."  Id.

## D.

In sum, neither the text of the Settlement Acts nor their pre- or post-enactment history requires the conclusion that the definition of the term "Penobscot Indian Reservation" in the Settlement Acts unambiguously excludes the waters at issue, such

- 129 -

that the rights in the "Reservation" under the Settlement Acts themselves that are actually at issue in this case do not extend to those waters. It is hardly unambiguous, therefore, that the Settlement Acts' definition of "Penobscot Indian Reservation" excludes the waters at issue, such that the Nation's sole right in them is conferred by § 6207(4) and that the Nation has no rights in them in consequence of what was "reserved to the Penobscot Nation by agreement." For, as I have explained, "islands in the Penobscot River reserved to the Penobscot Nation by agreement" is not itself a term with a fixed and readily identifiable geopolitical meaning. See Amoco Prod. Co., 480 U.S. at 547 & n.14. And, as the Supreme Court has made clear, the use of terms like "lands" and "islands" in a larger phrase does not, depending on context, necessarily exclude attendant waters. See, e.g., Alaska Pac. Fisheries, 248 U.S. at 89; Hynes, 337 U.S. at 110-11.

## IV.

The Penobscot Nation urges us, not unpersuasively, to conclude that the history (legislative and otherwise) itself suffices to demonstrate that its reading of § 6203(8) of the MIA -- given the ambiguity inherent in that provision's text and the text of § 6207(4) of that same statute -- is superior. But, the Nation recognizes that we need not do so for it to win.

"When we are faced with . . . two possible constructions, our choice between them must be dictated by a

principle deeply rooted in . . . Indian jurisprudence: '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" County of Yakima, 502 U.S. at 269 (third alteration in original) (quoting Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)); see also Antoine v. Washington, 420 U.S. 194, 199 (1975) ("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."). Thus, the Nation contends, and I agree, that the canon itself suffices to resolve this case in the Nation's favor.

Maine does argue that the Indian canons cannot apply here, even if the relevant statutory provision defining the "Reservation" is not itself clear. But, in light of this Court's opinion in Penobscot Nation v. Fellencer, 164 F.3d 706 (1st Cir. 1999), I cannot agree. See id. at 709 (construing the phrase "internal tribal matters" in the MIA and noting that it is a "general principle[] that inform[s] our analysis of the statutory language" that "special rules of statutory construction obligate us to construe 'acts diminishing the sovereign rights of Indian tribes . . . strictly,' 'with ambiguous provisions interpreted to the [Indians'] benefit'" (third and fourth alterations in original) (first quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir. 1994); and then quoting County

of Oneida, 470 U.S. at 247)); <u>see also</u> <u>Maynard</u> v. <u>Narragansett Indian Tribe</u>, 984 F.2d 14, 16 & n.2 (1st Cir. 1993) (noting that the Rhode Island Indian Claims Settlement Act and its enacting legislation "would have to be construed to afford the Tribe the benefit of any ambiguity on the waiver-abrogation issue"); <u>Connecticut ex rel. Blumenthal</u> v. <u>U.S. Dep't of the Interior</u>, 228 F.3d 82, 92-93 (2d Cir. 2000) (construing the Connecticut Indian Land Claims Settlement Act to the benefit of the Mashantucket Pequot even though "the Tribe today is at no practical disadvantage" because the Supreme Court has applied the Indian canon even "where Indians were at no legal disadvantage").[53]

---

[53]     Maine and the Intervenors argue that specific provisions of the MICSA providing that "no law or regulation of the United States (1) which accords or relates to a special status or right of or to any Indian, Indian nation . . . [or] Indian lands . . . , and also (2) which affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine . . . shall apply within the State" preclude application of the canon of construction.  25 U.S.C. § 1725(h); <u>see also</u> <u>id.</u> § 1735(b) (providing that "[t]he provisions of any Federal law enacted after October 10, 1980, for the benefit of Indians, Indian nations, or tribes or bands of Indians, . . . which would affect or preempt the application of the laws of the State of Maine . . . shall not apply within the State of Maine" unless specifically provided). Even assuming that <u>Fellencer</u> did not resolve this issue, the claim is unavailing.  The Senate Report supports the view that these provisions apply to statutes enacted and rules promulgated and not to interpretive principles.  <u>See</u> S. Rep. No. 96-957, at 30-31 (citing as examples the Indian Child Welfare Act and the federal Clean Air Act).  Moreover, the MICSA's baseline is that "the laws and regulations of the United States which are generally applicable to Indians . . . shall be applicable in the State of Maine."  25 U.S.C. § 1725(h).  Although Maine argues that the case "has direct jurisdictional implications for the State" and that applying the canons would affect Maine's "jurisdiction" -- a term that the

Indeed, the majority does not dispute that the canon would apply in the event of an ambiguity.  See Maj. Op. 39-40.

Nor do Maine's and the Intervenors' arguments that, even if the Indian canon does apply, the canon against conveying navigable waters must take precedence over it change the result here.  Even if the navigable waters canon could apply to the circumstances here, where the federal government never held title to the river in trust for a state, there is no apparent tension between the idea that the state could hold "title" in the manner contemplated by the navigable waters canon and the notion that at the same time the Penobscot Nation has what it claims here:  use- and occupancy-based rights.  Thus, as an ambiguity-resolving principle, the navigable waters canon can do little work here.[54]

Senate Report suggests is to be "broadly construed," S. Rep. No. 96-957, at 30 -- there is a difference between an interpretive principle that could result in jurisdictional implications and statutes that control how state jurisdiction applies in Indian country.  Nothing in the legislative history clearly reaches the former as opposed to merely the latter.  The reference to Bryan v. Itasca County, 426 U.S. 373 (1976), in the Senate Report is no different.  It makes clear that the MICSA's reference to "civil jurisdiction" should not be construed to mean only jurisdiction over private civil litigation (i.e., adjudicative jurisdiction) but could also include the state's legislative jurisdiction.  But, it does not speak to whether interpretive canons fall within § 1725(h) of the MICSA.

[54]    To the extent Maine and the Intervenors make a separate argument that states presumptively gain title to beds of navigable waters upon statehood, see, e.g., United States v. Holt State Bank, 270 U.S. 49, 54-55 (1926); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 283-84 (1997), and thus that by the time the treaties were signed the Penobscot Nation no longer had any rights in the waters to reserve, there is no reason to think the drafters of the

The Indian canon, in contrast, is responsive to the interpretive question that we are left with. This canon is "rooted in the unique trust relationship between the United States and the Indians," Fellencer, 164 F.3d at 709 (quoting County of Oneida, 470 U.S. at 247), and that relationship applies here, see Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 373 (1st Cir. 1975). There is, moreover, especially good reason to think that a construction in the Nation's favor is in fact a fair proxy for Congress's intent, given the particular role

Settlement Acts incorporated the understanding that what was "reserved" never could have included the river for this reason and thus intended § 6203(8) of the MIA to refer only to uplands. Even if one thought there was some legal reason that the Nation could not have reserved rights in an area that included the waters in the treaties, notwithstanding an intent on the part of the treaty parties to permit the Nation to make such a reservation, the better understanding of the Settlement Acts is that Congress meant to incorporate the understanding of the treaty parties at the time. And, as I have noted, the evidence from the history shows that the treaty parties understood what had been reserved by the Nation at each juncture to include rights in waters and fisheries. In addition, the 1818 treaty itself granted to citizens of the Commonwealth the "right to pass and repass any of the rivers, streams, and ponds, which run through any of the lands hereby reserved, for the purpose of transporting their timber and other articles through the same." 1818 Treaty, supra, at 255. Whether or not that portion of the treaty refers to the Penobscot River, it at the least demonstrates that it was not the parties' understanding that the Penobscot Nation had no claim to any such navigable waters once Massachusetts became a state. Thus, especially when § 6207(4) of the MIA is brought into view, Maine and the Intervenors' contention about states presumptively gaining title to the beds of navigable waters upon statehood does nothing to clear up the ambiguity in the text that is plainly there and thus does nothing to preclude the application of the Indian canon.

Congress was playing in settling these land claims in the face of assertions that the Nonintercourse Act had been violated.

## V.

Notwithstanding the differences between Congress's reference to the "body of lands known as Annette Islands" in the statute at issue in <u>Alaska Pacific Fisheries</u> and the Settlement Acts' way of referring to these islands here, this much is -- at the very least -- clear:  § 6203(8) of the MIA does not compel an uplands-only reading, whether it is considered in the context of the Settlement Acts as a whole or in the context of the circumstances that led to their enactment.  We thus are obliged to resolve the ambiguity in the Penobscot Nation's favor.  For, while the Settlement Acts confirm that the Penobscot Nation gave up any claim (aboriginal or otherwise) to the lands with which they had parted through earlier treaties made without the required federal authorization, I cannot see how we could say that it is equally plain that the text of those Acts also confirms that the Acts do not protect the Penobscot Nation's historic rights to the area comprising the islands that the Nation now claims in this appeal. Before we conclude that a statute purporting to honor what this riverine Nation had "reserved . . . by agreement" in fact deprives it of the sovereign rights that it had long enjoyed in the river that defines it, we must have a clearer indication than is present

here that the statute was intended to have such a dramatic and potentially devastating consequence.

Accordingly, I respectfully dissent.